**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Petitioner,**

**v.**

**JEFFERSON ASSOCIATES, LTD. and F.B. Goldman, Respondent.**

**No. D–3096.**

Supreme Court of Texas.

Argued Sept. 14, 1993.

Decided March 16, 1995.

Rehearing Overruled May 11, 1995.

John L. Hill, Houston, Edwin R. DeYoung, John K. Schwartz, Mark G. Yudof, Austin, for petitioner.

Douglass D. Hearne, Don W. Kothmann, Carey S. Leva, Robert J. Hearon, Selden Anne Wallace, Robert Clar Heidirck, Jr., Austin, for respondent.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice and GONZALEZ, HIGHTOWER and OWEN, Justices, join.

ENOCH, Justice, took no part in the consideration or decision of this case.

We granted writ of error in this case to decide whether a buyer who agrees, freely and without fraudulent inducement, to purchase commercial real estate "as is" can recover damages from the seller when the property is later discovered not to be in as good a condition as the buyer believed it was

when he inspected it before the sale. We hold he cannot.

## I

F.B. Goldman bought the Jefferson Building, a four-story office building in Austin, from The Prudential Insurance Company of America in 1984. Over two years later Goldman discovered that the building contained asbestos fireproofing. He then filed this suit against Prudential. (Four months after he bought the building, Goldman conveyed it to Jefferson Associates, Ltd., a limited partnership which he formed with other investors for the purpose of owning the building, and which is a plaintiff with Goldman in this suit. Because their interests are aligned, we refer to Goldman only.) The gist of Goldman's complaints is that Prudential misrepresented the condition of the building to him and failed to disclose that it contained asbestos which impaired its value. Prudential vigorously disputes Goldman's allegations, but since Goldman prevailed at trial, we must view the evidence in the light most favorable to him. Prudential's central argument here is a legal one, namely, that Goldman is not entitled to damages because he bought the building "as is".

Prudential provided the original permanent financing for construction of the Jefferson Building in 1972 and acquired the building four years later through foreclosure. In 1983, Prudential offered the building for sale by a closed bidding process in which offers were submitted in the form of proposed contracts. Prudential invited bidders to review financial records pertaining to the building and to inspect the premises. Goldman had tried to buy the building from Prudential before, and he submitted a bid. Goldman was a knowledgeable real estate investor who owned an interest in at least thirty commercial buildings. He was president of Transland Management Company, a commercial property management firm in Dallas that had developed, built, rehabilitated, owned or managed properties valued altogether at about $100 million. He had bought and sold several large investment properties on an "as is" basis.

Before bidding on the building, Goldman had it inspected by his maintenance supervisor, Timmy Don Kirk, and also by his property manager and an independent professional engineering firm. Kirk testified that Donna Buchanan, Prudential's on-site property manager, told him that the building was "superb", "super fine", and "one of the finest little properties in the City of Austin". Kirk also testified that Buchanan told him that the building had no defects except for a mechanical room foundation problem. These are the statements Goldman claims misrepresented the condition of the building, and we assume they were made.

Kirk asked Buchanan for the building plans and specifications, but she mistakenly told him she had only the "as-built" drawings, which she gave him. She referred him to the architects for additional information. Neither Goldman nor anyone on his behalf contacted the architects or made any further effort to obtain the plans and specifications. In fact, Prudential had the plans and specifications Kirk requested but did not make them available to Goldman during their negotiations. Prudential contends it could not locate the plans and specifications at the time; Goldman contends Prudential concealed them. Again, we assume Goldman is correct. Those specifications called for use of a fireproofing material called Monokote®, or an approved substitute. Information published by the manufacturer of Monokote® about the time the building was built stated that the product contained asbestos; but information published several years later stated that the product did not contain asbestos. Kirk was not aware of any of this information and stated that had he seen plans calling for Monokote®, he would not have known that the product might have contained asbestos. Even someone aware of the information published by the manufacturer could not be certain whether any Monokote® used in the Jefferson Building contained asbestos. Nor could anyone be certain from the specifications alone whether Monokote®, or an approved substitute, was actually used in the building. Thus, when the original architects reviewed the specifications in 1987, some three years after the sale, they saw nothing

to indicate that the building contained asbestos.

Throughout the 1970s there was a growing public concern that asbestos in a building could pose a health hazard. By 1983, before the sale to Goldman, Prudential knew of this concern and feared that it could adversely affect a building's marketability. Prudential also knew that buildings built about the same time as the Jefferson Building often contained asbestos fireproofing, and that there was thus a good chance that asbestos was used in the Jefferson Building. However, there is no evidence that Prudential actually knew before Goldman filed this lawsuit that the Jefferson Building contained asbestos. Goldman and Kirk testified that they were unaware of the public concern over asbestos and thus did not raise the issue during negotiations with Prudential.

Goldman bought the Jefferson Building for $7,150,000 cash. The contract he submitted contained the following provision:

> As a material part of the consideration for this Agreement, Seller and Purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. Purchaser takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents). Provisions of this Section 15 shall survive the Closing.

The contract also provided: "In no event shall a Purchaser have the right to recover consequential damages. Purchaser hereby waives any action under the Texas Deceptive Trade Practices Act."

Three years later, when Goldman tried to refinance the building, a potential lender required evidence that the building did not contain asbestos. Goldman obtained a letter to that effect from the two original architects, which was based on their review of the construction specifications. When the building was inspected, however, the asbestos fireproofing was discovered. Goldman then sued Prudential alleging violations of the Texas Deceptive Trade Practices—Consumer Protection Act, TEX.BUS. & COM.CODE §§ 17.41–.63 ["the DTPA"], fraud, negligence, and breach of the duty of good faith and fair dealing.

At trial, the parties agreed to submit a single question to the jury concerning liability: "Do you find from a preponderance of the evidence that the Plaintiffs should be entitled to recover damages from the Defendant as the result of any wrongful conduct by the Defendant?" The jury answered this question affirmatively. While there was evidence at trial that the asbestos in the building did not pose a health hazard, did not need to be removed, and could be managed in place at a cost of $61,000, the jury found that the difference between the consideration Goldman paid and the value received was $6,023,993.03. The jury also found that punitive damages should be awarded against Prudential in the amount of $14,300,000.00. In accordance with the verdict, the trial court rendered judgment which, including interest, costs and attorney fees, totaled $25,692,571.58. The court of appeals affirmed. 839 S.W.2d 866.

## II

### A

■ The effect of the jury's affirmative answer to the question quoted above is to establish Prudential's liability for actual damages on any cause of action pleaded by Goldman that is supported by some evidence. However, combining all liability theories in a single question does not obviate the necessity for proof of all elements of at least one cause of action. Stated another way, Goldman is entitled to recover damages if, but only if, some evidence supports each element of one pleaded cause of action. Neither Goldman nor Prudential disputes that this is the proper method of analyzing this case.

■ Proof of causation is essential for recovery on all of Goldman's causes of action. Negligence, for example, requires proof of

proximate cause. *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex.1988). For DTPA violations, only producing cause must be shown. TEX.BUS. & COM.CODE § 17.50(a). The element common to both proximate cause and producing cause is actual causation in fact. *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex.1993). This requires proof that an act or omission was a substantial factor in bringing about injury which would not otherwise have occurred. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980). Unless there is some evidence that Prudential caused Goldman damages, and this evidence satisfies the requirement of actual causation in fact, Goldman is not entitled to recover on any of his claims.

■ We think Goldman's agreement to buy the Jefferson Building "as is" precludes him from proving that Prudential's conduct caused him any harm. By agreeing to purchase something "as is", a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.*, 572 S.W.2d 308, 313 (Tex.1978). The seller gives no assurances, express or implied, concerning the value or condition of the thing sold. *See* TEX.BUS. & COM.CODE § 2.316(c)(1) ("as is" agreement excludes implied warranties in contract covered by UCC). Goldman agreed to take the property "with any and all latent and patent defects" "under the express understanding that there are no express or implied warranties" (except those related to title), including specifically, "that there is no warranty by Seller that the Property is fit for a particular purpose." Goldman acknowledged that he was not "relying upon any representation, statement or other assertion with respect to the Property condition" and was instead relying upon his own "examination of the Property." While it should not be necessary in every "as is" provision to go into this much detail, Goldman's contract leaves no doubt exactly what he agreed to.

Goldman's "as is" agreement negates his claim that any action by Prudential caused his injury. His contractual disavowal of reliance upon any representation by Prudential was an important element of their arm's-length transaction and is binding on Goldman unless set aside. The "as is" agreement negates causation essential to recovery on all the theories Goldman asserts—DTPA violations, fraud (excluding, of course, fraud in the inducement of the "as is" agreement, which Goldman does not assert), negligence, and breach of the duty of good faith and fair dealing. Thus, Goldman's injury could not have been caused by Prudential.

■ A valid "as is" agreement, like the one in this case, prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is impossible for the buyer's injury on account of this disparity to have been caused by the seller. *See Mid Continent*, 572 S.W.2d at 313 (the buyer "has taken the entire risk as to the quality of the [property] and the resulting loss"); *see also Dubow v. Dragon*, 746 S.W.2d 857, 860 (Tex.App.—Dallas 1988, no writ) ("as a matter of law, [buyers'] 'careful' inspection of the house's condition constituted a new and independent basis for the purchase which intervened and superseded [sellers'] wrongful act"); *Camden Machine & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 312 (Tex.App.—Fort Worth 1993, no writ) (characterizing *Dubow* as holding that "the producing cause was [buyer's] reliance on the inspection and professional opinions which constituted a new and independent basis for the purchase"). The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself. He has agreed to take the full risk of determining the value of the purchase. He is not obliged to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage.

JUSTICE CORNYN's concurring opinion argues that Goldman's "as is" agreement is

relevant to whether Prudential caused him harm, but not controlling. If Goldman's position at trial were the same as the position he took in the "as is" agreement, he could not recover on any of the theories he asserts. Unable to show any reason why the agreement should not be enforced, such as fraudulent inducement, Goldman ought to be held to his voluntary, freely negotiated affirmation that he was depending on his own assessment of the building. JUSTICE CORNYN's concurring opinion suggests that Prudential should prevail if this was an arm's-length transaction. Goldman does not dispute that it was.

■ By our holding today we do not suggest that an "as is" agreement can have this determinative effect in every circumstance. A buyer is not bound by an agreement to purchase something "as is" that he is induced to make because of a fraudulent representation or concealment of information by the seller. *Weitzel v. Barnes*, 691 S.W.2d 598, 601 (Tex.1985); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 240 (Tex.1957); *see Cockburn v. Mercantile Petroleum, Inc.*, 296 S.W.2d 316, 326 (Tex.Civ.App.—Dallas 1956, writ ref'd n.r.e.). A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase "as is", and then disavow the assurance which procured the "as is" agreement. Also, a buyer is not bound by an "as is" agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct. A seller cannot obstruct an inspection for defects in his property and still insist that the buyer take it "as is". In circumstances such as these an "as is" agreement does not bar recovery against the seller.

■ We also recognize that other aspects of a transaction may make an "as is" agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered. Where the "as is" clause is an important part of the basis of the bargain, not an incidental or "boiler-plate" provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect. JUSTICE CORNYN's concurring opinion argues that such factors are generally not important, and that "as is" agreements must be given the same effect in every transaction absent fraud or adhesion. We simply disagree. We think it too obvious for argument that an "as is" agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.

**B**

Goldman makes essentially three arguments for avoiding his "as is" agreement. First, he argues that Prudential knew the Jefferson Building might have asbestos in it because other buildings constructed about the same time often contained asbestos, and because the plans and specifications called for use of Monokote®. There is also evidence that Prudential knew that the presence of asbestos in a building could impair its marketability. Goldman argues that Prudential should have advised him of these concerns.

■ While there may be evidence that Prudential should have suspected the presence of asbestos in the Jefferson Building, there is no evidence that Prudential actually knew of the asbestos. A seller has no duty to disclose facts he does not know. *Robinson v. Preston Chrysler–Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex.1982). Nor is a seller liable for failing to disclose what he only should have known. *Ozuna v. Delaney Realty, Inc.*, 600 S.W.2d 780, 782 (Tex.1980) (per curiam). Even under the DTPA, a seller is not liable for failing to disclose information he did not actually know. TEX.BUS. & COM. CODE § 17.46(b)(23). Prudential had no duty to investigate the presence of asbestos in the Jefferson Building, or to disclose to Goldman any general concerns it may have had about asbestos in buildings. Had Goldman acquainted himself with public concerns about asbestos, he would have had almost as much basis for being concerned about the presence of asbestos as Prudential did. Prudential

had no reason to think that Goldman was not fully informed on the subject of asbestos. Absent any specific knowledge of asbestos in the Jefferson Building, Prudential was not obliged to raise the subject.

■ Second, Goldman argues that Prudential interfered with his investigation by withholding the plans and specifications he requested. Assuming, as we must in reviewing the disputed evidence in the record, that Prudential did withhold the plans and specifications, this action could not have interfered with Goldman's inspection. One could not tell from the plans and specifications whether Monokote® or some other product was used in the building, or whether any Monokote® that was used contained asbestos. The architects who reviewed the plans and specifications for Goldman after he purchased the building concluded that there was no asbestos in the building. The only way to determine whether asbestos was present in the building was to inspect the premises, and Goldman does not claim that Prudential interfered with his inspection in any way.

■ Third, Goldman argues that statements made by Prudential's building manager, Buchanan, to Goldman's maintenance supervisor, Kirk, were fraudulent misrepresentations. As noted above, Buchanan told Kirk that the building was "superb", "super fine", and "one of the finest little properties in the City of Austin". These statements were not misrepresentations of material fact but merely "puffing" or opinion, and thus could not constitute fraud. *Cf. Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex.1980) (statement that boat and motor were "new" or in "excellent" or "perfect" condition were not merely puffing or opinion); *see also Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462–464 (Tex.App.—Dallas 1990), *writ denied per curiam*, 800 S.W.2d 853 (Tex.1991). Nor do we think Buchanan's statement that there were no defects in the building other than the foundation in the mechanical room was a statement of material fact, since Kirk does not claim to have attached much significance to it, certainly not enough on which to base a decision whether to spend over $7 million to buy an office building. Even if he had attached more significance to Buchanan's statement, there is no evidence whatever that Buchanan knew or had any reason to suspect that her statements were not absolutely correct, or that Buchanan knew that the building contained asbestos. A statement is not fraudulent unless the maker knew it was false when he made it or made it recklessly without knowledge of the truth. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990); *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977). Since there is no evidence that Buchanan's statement to Kirk was fraudulent, it cannot be grounds for avoiding the "as is" agreement.

None of Goldman's arguments avail to avoid the "as is" agreement. The thrust of Goldman's arguments is that Prudential, with its experience in owning and operating commercial buildings around the country, was far more aware than he was of the problems presented by asbestos. Prudential was simply not responsible for Goldman's lack of experience with asbestos, nor was it responsible for educating him on the subject. The problems of asbestos had been well known and publicly discussed for years when Goldman bought the Jefferson Building. Goldman's agreement to buy the building "as is" precludes him from recovering damages against Prudential.

### III

While the "as is" agreement in this case negates the element of causation essential to all of Goldman's claims, two problems under the DTPA remain to be addressed.

### A

■ Section 17.42 of the DTPA states that a "waiver by a consumer of the provisions of [the DTPA] is contrary to public policy and is unenforceable and void...." Tex.Bus. & Com.Code § 17.42. The provision in Goldman's contract expressly waiving any action under the DTPA violates this prohibition and is therefore void. The "as is" provision, however, does not violate the prohibition.

Goldman's "as is" agreement is not a waiver of DTPA rights; it is a statement that no

basis exists for the assertion of such rights. Goldman agreed in the "as is" provision, not that he would never sue Prudential for breach of express and implied warranties in violation of the DTPA, but that no warranties were made. The agreement states: "Purchaser takes the Property under the express understanding there are no express or implied warranties...." Goldman's agreement was not that he would never claim that Prudential's conduct caused him harm, but that in fact Prudential did not harm him and could not have done so, since he was relying entirely upon his own examination of the property. The agreement states: "Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property." Having made these admissions freely in a negotiated agreement, Goldman is bound by them. Goldman's agreement does not say he cannot sue Prudential for violating the DTPA; it says he cannot win the suit. He cannot win because he has asserted facts which negate proof of causation required for recovery.

JUSTICE CORNYN's concurring opinion charges that the Court has rewritten the DTPA, substituting its will for the Legislature's. Our decision does no violence to the DTPA. A buyer like Goldman simply confirms by his agreement precisely what was and was not the producing cause of the agreement, and accordingly what could and could not be the producing cause of any injury the buyer might suffer.

### B

Our decision in this case does not conflict with our opinion in *Weitzel v. Barnes*, 691 S.W.2d 598 (Tex.1985), a case on which Goldman and Prudential both rely. To the contrary, *Weitzel* provides support for the conclusion we reach here.

The Weitzels bought a remodeled home under a contract which gave them the right to inspect the home and provided that if they failed to do so they agreed to accept it in the condition received. The Weitzels' agreement did not state, as Goldman's did, that they were relying entirely on their own inspection of the property and not on any statement made by their seller. Unlike Goldman, the Weitzels did not inspect the property, and when they found that the plumbing and air conditioning systems did not function properly, they sued the seller for representing to them that those systems complied with city code specifications. The Weitzels alleged that the seller made this representation to induce them to buy the home, and that based upon this representation they did not inspect the home before closing. The court of appeals held that admission of evidence of the representation violated the parol evidence rule, but in dicta stated that proof of reliance was required to show a DTPA violation. *Barnes v. Weitzel*, 678 S.W.2d 747, 750 (Tex. App.—Fort Worth 1984). This Court held that evidence of the representation was not parol, and in its own admitted dicta, stated that proof of reliance was not required by the DTPA.

The issue which is dispositive in Goldman's case—whether his "as is" agreement establishes that Prudential could not have been a producing cause of his harm—was not raised in *Weitzel*. The Court indicated that if the Weitzels' seller had not represented the condition of the property, the "as is" agreement might have protected him from liability. But the seller did not argue, and the Court did not consider, whether an "as is" agreement is enforceable unless fraudulently induced, or how it would affect proof of causation.

*Weitzel* does confirm, however, that proof of producing cause is required to establish liability under the DTPA. 691 S.W.2d at 600. That requirement is the focus of our decision in the present case. Thus, we view today's decision as consistent with *Weitzel*.

\* \* \* \* \* \*

For the reasons explained, we conclude that Goldman's agreement to buy the Jefferson Building "as is", in these circumstances, conclusively shows that nothing Prudential did caused Goldman damages. Accordingly, we reverse the judgment of the court of appeals and render judgment that Goldman take nothing.

GONZALEZ, Justice, concurring.

I join the Court's opinion and judgment because in my opinion, an "as is" clause

negates producing cause as a matter of law absent evidence of fraudulent inducement or concealment of information by the seller. Even if the "as is" clause is not dispositive, the result is the same because there is no evidence of producing cause in the case before us. I write separately to reiterate my view expressed in my dissenting opinion in *Weitzel v. Barnes,* 691 S.W.2d 598, 601 (Tex. 1985), that a consumer's reliance on a representation is a necessary aspect of producing cause. The Court in *Weitzel* rejected that view, but the Court today rectifies this error by necessarily recognizing reliance as an integral element of producing cause in a DTPA cause of action based on a representation.

The contract for sale in this case is similar to the contract in *Weitzel.* Both contracts were "as is" contracts which gave the buyer the right to inspect the property prior to closing. However, in *Weitzel,* the buyer (who was an attorney) chose to forgo an inspection and bought the old house even though he had actual notice that the city had condemned the property. Our Court glossed over the fact that there was no evidence that the seller's representation was a producing cause of any damages, *see id.* at 603 (Gonzalez, J., dissenting), and held that an oral representation concerning the condition of the house could be the basis of an action under the DTPA. *Id.* at 600.

In this case, Goldman, a sophisticated real estate investor, conducted his own inspection of the property. He then purchased the building "as is." The "as is" clause states in pertinent part:

> Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property.

There is no evidence that anyone at Prudential knew of the presence of asbestos. There is likewise no evidence that any representation made by Prudential was a producing cause of Goldman's damages because Goldman conducted his own inspection of the building. According to the express terms of the contract, Goldman relied *solely* upon his inspection. Without proof that he relied upon Prudential's representations, Goldman has failed to prove producing cause, an essential element of a DTPA cause of action.

I recognize that reliance is not an express element of a cause of action under the DTPA. However, as I stated in *Weitzel,* in the context of a representation, "reliance on the deceptive act or conduct is necessarily a factor of producing cause." *Id.* at 602 (Gonzalez, J., dissenting). The Court today returns to reason by reinstating reliance as an essential part of producing cause in a DTPA claim premised on a representation.

CORNYN, Justice, concurring, joined by GAMMAGE and SPECTOR, Justices.

I join the Court's judgment, but for different reasons from those given in the Court's opinion. The Court concludes that, in the context of an "as is" sale, the statement "There are no defects in this building," is not an actionable misrepresentation "unless the maker knew it was false," *supra,* 896 S.W.2d at 161, and that an "as is" sale makes it "impossible for the buyer's injury ... to have been caused by the seller." *Supra,* 896 S.W.2d at 161. Under current Texas law, I disagree on both counts.

The Court holds that the "as is" clause, as a matter of law, negates producing cause. To avoid running afoul of the non-waiver provisions of the DTPA, the Court characterizes the clause as "a statement that no basis exists for the assertion of [DTPA] rights," *supra* 896 S.W.2d at 164, rather than as a waiver of DTPA rights. In my view, this is a distinction without a difference and cannot be conclusive of Prudential's DTPA liability.

Never before has this Court questioned the enforceability of the non-waiver provision of section 17.42 of the DTPA. Only when exacting requirements are met can a consumer waive the provisions of the DTPA, and neither party argues that these requirements were met in this case.[1] Otherwise, the Leg-

1. Under the pre–1989 version of § 17.42 of the DTPA, for a waiver to be effective the defendant had to prove that the consumer (1) had assets over $5 million, (2) had experience in financial and business matters that enabled it to evaluate the merits and risks of a transaction, and (3) was

islature has unequivocally declared that "[a]ny waiver by a consumer of the provisions of this subchapter is *contrary to public policy and is unenforceable and void....*" (emphasis added). TEX.BUS. & COM.CODE § 17.42. Consistent with this statute, just four years ago we held that contractual liability limitations are invalid under section 17.42 insofar as they purport to waive liability for an act defined as deceptive under section 17.46(b), the DTPA laundry list of prohibited acts. *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 576 (Tex.1991). Again, only nineteen months ago we reiterated "that when representations are made, a consumer cannot waive DTPA protection." *First Title Co. v. Garrett,* 860 S.W.2d 74, 77 (Tex.1993). Now, inexplicably, the Court reverses course and rewrites the DTPA.

Under the Court's holding, an "as is" clause precludes a DTPA action for misrepresentation unless the contract can be set aside under traditional contract doctrines, such as fraud or coercion. Although the Court strains to limit its holding to the facts of this case, I doubt that is possible.

The rationale by which the Court decides this case will have broad application no matter how much the Court attempts to qualify its holding. First, the Court's holding does not prevent insertion of an "as is" clause in a form contract in routine consumer transactions. Unless tainted by fraud, coercion, or grossly disparate bargaining power, this clause will from now on insulate the seller from DTPA liability *as a matter of law,* even if the consumer fails to notice it, or having read it, misunderstands its legal implications. As in this case, this will be true even if the seller makes misrepresentations about the product. It is not enough to point out that this particular "as is" clause was negotiated by the parties. Under Texas law, parties are generally bound by their contracts whether

the contracts were vigorously negotiated or not. While I am sympathetic to the notions of freedom of contract upon which the Court's decision appears grounded, the Legislature has preempted the common law in this area and, as a matter of public policy, explicitly banned the use of waivers of the DTPA except in limited situations not applicable here. The Court has simply substituted its will for that of the Legislature. Even if the Court views this outcome as preferable public policy, it should defer to the Legislature as the primary policy maker, especially in a field in which the Legislature has been so active in revising and amending the governing statute.[2]

Second, the Court's holding is unlikely to be limited to traditional "as is" clauses. An "as is" clause in a contract effectively disclaims only implied warranties. *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.,* 572 S.W.2d 308, 313 (Tex. 1978). We have never held that an "as is" clause automatically bars actions on express warranties[3] or misrepresentations. To the contrary, we have repeatedly held that contractual provisions that do not comply with section 17.42 are unenforceable. This rule also makes common sense. A seller should not be able to misrepresent some fact essential to the consumer's decision to buy, and then automatically avoid liability by asserting a contractual disclaimer of all DTPA liability. Yet the Court's holding would allow any "as is" clause to preclude liability for all non-fraudulent misrepresentations.

I would hold that the existence of the "as is" clause in this case *is relevant* to the producing cause inquiry; *but it is not controlling,* as the Court holds. Because the clause asserts that the buyer is not relying upon any representations made by the seller, it is pertinent to the question of whether the

not in a significantly disparate bargaining position. TEX.BUS. & COM.CODE § 17.42 (1987).

**2.** As this is being written, the Texas Senate is debating amendments to this very statute. *See* Tex.S.B. 26, 74th Leg., R.S. (1995) (proposing, among other things, to exclude from DTPA coverage claims by partnerships and corporations, to limit the applicability of the DTPA to transactions valued a $500,000 or less, and to require all

violations to be made "knowingly" before recovery is allowed).

**3.** *See* TEX.BUS. & COM.CODE § 2.313(a) (providing that express warranties are created by either an affirmation of fact or promise relating to the goods, or a description of the goods, or a sample or model, which becomes a part of the basis of the bargain).

misrepresentation caused the buyer's damages. When the seller can establish to the jury's satisfaction that the clause was actually negotiated in an arms-length transaction, the seller may indeed prevail, but this fact issue should not be decided by a court as a matter of law, as the Court does today.

There is, however, an alternative basis for the Court's judgment. I agree with Prudential that there is no evidence that Donna Buchanan's innocent misrepresentation of "no defects" was a producing cause of Goldman's losses. While Goldman need not prove reliance on the statement, *see Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex.1985), the producing cause requirement under the DTPA mandates proof that the statement was a cause-in-fact of the damages suffered. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471–72 (Tex.1991); *accord McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980). Proof of producing cause, therefore, must include proof that the misrepresentation "was a substantial factor in bringing about the injury and without which no harm would have occurred." *McClure*, 608 S.W.2d at 903.

I find no evidence in the record that Buchanan's statement influenced Goldman's behavior in any way. In fact, the evidence points to the opposite conclusion. Goldman was a sophisticated real estate investor who performed his own evaluation and inspection of the Jefferson building in making his purchase decision. He testified that he would have purchased the Jefferson building even if Ms. Buchanan had told him it contained Monokote. Furthermore, there is no claim that Ms. Buchanan had any special expertise on such matters, and the statement attributed to her was admittedly made in an informal setting without reference to any specific characteristic of the building. In this context, there is no evidence that this statement was a substantial factor in Goldman's decision to buy the building.

Without evidence of causation, Goldman's claim must fail. Thus, I concur in the Court's judgment.