**Doak C. PROCTER III and College Street, Ltd., Appellants,**

v.

**RMC CAPITAL CORPORATION, RMC Properties I, Ltd, RMC Genpar I, Inc., Catherine Cox Mullen, and C. Mitchell Cox, Appellees.**

No. 09–00–161 CV.

Court of Appeals of Texas, Beaumont.

Submitted March 8, 2001.

Decided June 28, 2001.

Keith Kebodeaux, Beaumont, for appellant.

James R. Old, Jr., Kelli B. Smith, Germer, Bernsen & Getz, L.L.P., Jon B. Burmeister, Moore Landrey, L.L.P., Beaumont, for appellee.

Before WALKER, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a summary judgment. Appellants filed suit against appellees alleging both common law fraud, and statutory fraud under TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 1987). The underlying transaction involved the sale by appellees of a certain tract of income producing rental property to appellants. The appellees provided two bases for their motion for summary judgment, viz: (1) Appellants sustained no damages; and (2) "There can be no fraud as a matter of law because all warranties are disclaimed in the sale documents and the Plaintiffs, sophisticated purchasers in an arm's length transaction released any claims for misrepresentation in the contract of sale."

The record before us reflects that appellant-Doak Procter, III, was the president and corporate general partner of appellant-College Street, Ltd. The record also reflects that Procter negotiated the purchase and eventually executed the sale's contract on behalf of College Street, Ltd. for purchase of "certain income producing rental properties" from appellees. There is record evidence indicating appellees are also in the business of purchasing and selling commercial real estate. At any rate, neither side contests the fact that the transaction in question was negotiated at arms length and that both parties were knowledgeable and sophisticated business entities.

On appeal from the granting of a summary judgment, the reviewing court must determine whether the evidence establishes, as a matter of law, that there is no genuine issue of material fact. *Rodriguez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 413 (Tex.1989). In deciding whether a disputed material fact issue exists, the evidence is viewed in favor of the non-movant, resolving all doubts and indulging all reasonable inferences in his favor; with the non-movant's evidence taken as true. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). A defendant as a movant must either: (1) disprove at least one element of each of plaintiff's theories of recovery; or (2) plead and conclusively establish each essential element of an affirmative defense. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 679 (Tex.1979). Once the movant has established a right to summary judgment, the non-movant must expressly present any reasons seeking to avoid the movant's entitlement, and must support the reasons with summary judgment proof to establish a fact issue. *Westland Oil Dev. Corp. v.*

*Gulf Oil Corp.,* 637 S.W.2d 903, 907 (Tex. 1982).

■ Appellant's cause of action was grounded in both common law and statutory fraud. Under both types of fraud, reliance is an element. *See Ins. Co. of North America v. Morris,* 981 S.W.2d 667, 674 (Tex.1998); TEX. BUS. & COM.CODE ANN. § 27.01(a)(1)(B) (Vernon 1987). In the instant case, appellees' motion for summary judgment was based, *inter alia,* on disproving the element of reliance as a matter of law. In so doing, the appellees pointed to the very detailed language contained in the portion of the "Contract of Sale" (contract) signed by both parties, the pertinent portions of which we reproduce as follows:

ARTICLE VII

*REPRESENTATIONS, WARRANTIES AND AND (sic) ACKNOWLEDGMENTS OF BUYER; DISCLAIMERS OF SELLER*

7.1 *Representations, Warranties and acknowledgments of Buyer.* Buyer represents, warrants, covenants, and agrees with seller as of the Effective Date and as of the Closing Date, except where specific reference is made to another date or dates, that:

. . . .

(c) Buyer hereby acknowledges that:

(i) Buyer is purchasing the Property, and the Property shall be conveyed and transferred to Buyer, "AS IS, WHERE IS, AND WITH ALL FAULTS" and specifically and expressly without any warranties, representations, or guarantees, either express or implied, of any kind, nature, or type whatsoever from or on behalf of Seller, except for those expressly set forth herein and the warranty of title in the Deed. Buyer acknowledges that Buyer has not relied, and is not relying, on any information, document, sales brochures, or other literature, maps or sketches, projection, pro forma, statement, representation, guarantee, or warranty (whether express or implied, or oral or written, or material or immaterial) that may have been given by, or made by, or on behalf of, Seller;

(ii) SELLER HAS NOT, DOES NOT, AND WILL NOT WITH RESPECT TO THE PROPERTY, MAKE ANY WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR USE, OR WITH RESPECT TO THE VALUE, PROFITABILITY OR MARKETABILITY OF THE PROPERTY;

. . . .

(iv) Buyer has and will have, pursuit to this Contract, an adequate opportunity to make such legal, factual, and other inquiries and investigations as it deems necessary, desirable, or appropriate with respect to the Property. Such inquiries and investigations of Buyer shall be deemed to include, but shall not be limited to, any leases and contracts pertaining to the Property, the physical components of all portions of the Property, the condition of the Property, such state of facts as an accurate survey and inspection would show, the present and future zoning ordinances, resolutions, and regulations of the city, county, and state where the Property is located, and the value and marketability of the Property; and

(v) Without in any way limiting the generality of the preceding subsections (i) through (iv), Buyer specifically acknowledges and agrees that Buyer hereby WAIVES, RELEASES, AND DISCHARGES any claim Buyer has, might have had, or may have against Seller with respect to the condition of the Property, whether such condition is patent or latent, Buyer's ability or inability to obtain or maintain building permits, either temporary or final certificates of occupancy, or other licenses for the use or operation of the Property and/or certificates of compliance for the Property, the actual or potential income or profits to be derived from the Property, the real estate taxes or assessments now or hereafter payable thereon, the compliance with any environmental protection, pollution or land use laws, rules, regulations or requirements, and any other state of facts which exist with respect to the Property. (all emphasis and capitalization in original)

Additional summary judgment evidence was attached to appellees' motion. The entire sales' contract appears. There is also an affidavit from Worth Williams, the owner of Worth Williams Properties, L.C., located in Dallas, Texas, which states that on November 19, 1999, Williams forwarded a real estate sales' contract to Procter and College Street, Ltd., offering to purchase the property in question for $1,300,000, payable in cash at closing. The offer remained open through December 15, 1999, however Procter did not respond with an acceptance, a counter-offer, or a rejection of the offer.

An affidavit from Gerald Richardson appears as the last exhibit attached to the summary judgment motion. Richardson, a licensed real estate broker, had worked in such capacity in the Beaumont, Texas, area for nine years. Mr. Richardson explained that while he was not an "appraiser" of commercial real estate *per se,* he was often called upon to evaluate the market value of commercial real estate in the Beaumont area. At that time, he had performed many such evaluations for his clients, which included appellees, in order to assist them in determining both sale and purchase prices for commercial property. Mr. Richardson then provided a detailed background of his involvement in the initial listing for sale, negotiations, and ultimate sale of the property in question.

Richardson entered into a listing agreement with appellees regarding the property on January 31, 1996. Included among the various business tenants on the property was Cox Video Corp., a video rental store. On March 14, 1997, Richardson prepared an opinion of value concerning the property with Richardson believing the property was worth $1,245,000. The property was listed for sale on March 27, 1997, at the price of $1,450,000. On April 8, 1997, Procter made an offer to purchase the property for $1,100,000. Richardson described Procter as known "to be an experienced real estate investor who owned numerous local real estate properties, including another retail center across the street from Parkdale Mall in Beaumont. I knew him to be very familiar with the market and informed [appellees] of that fact." Ultimately, appellees accepted a $1,125,000 offer from Procter for the property on approximately December 19, 1997.

Richardson then provided Procter with a copy of a Cox Video Corp. balance sheet dated "March 31, 1997." It had been forwarded to Richardson from appellee-C. Mitchell Cox. As far as Richardson was aware, appellees did not prepare the balance sheet or vouch for its accuracy. Richardson did discuss the contents of the balance sheet with Procter, including the

reason for a large cash balance being shown on the sheet. Richardson recalled Procter to be satisfied with the information provided. Richardson was unaware how Procter intended to use the information contained on that sheet, if he used it at all for any purpose. Although Richardson did not recall the exact date he provided the balance sheet to Procter or the date of their discussion of said sheet, it was apparently prior to Procter's final offer being accepted by appellees.

The record reflects that the contract was signed by Procter on February 4, 1998. Richardson further relates that prior to the conclusion of the sale of the property, Procter was represented by legal counsel with regard to the transaction "including the preparation of the Contract of Sale and related documents." This assertion by Richardson is not contested by Procter in his summary judgment response. Richardson concludes by saying that in his professional opinion, the $1,125,000 sale price for the property was reasonable at the time of the sale, that, as far as he knew, appellees were always "straightforward" in their dealings with Procter, and that he [Richardson] was unaware of any specific inaccuracies in the Cox Video Corp. balance sheet provided to Procter.

In *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 158 (Tex.1995), the Supreme Court addressed the issue of whether a buyer who agrees freely, and without fraudulent inducement, to purchase *commercial* real estate "as is," can recover damages from the seller when the property is later discovered not to be in as good a condition as the buyer originally believed when he inspected the property before the sale. In *Prudential,* the purchase agreement stated that the buyer was purchasing the building "as is," was not relying on any representa-

tions made by the seller, was relying on his own inspections of the building, and was taking the building without any express or implied warranties other than warranties of title. *Id.* at 160. As the Court in *Prudential* observed:

> The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself. He has agreed to take the full risk of determining the value of the purchase. He is not obligated to do so; he could insist instead that the seller assume part or all of that risk by obtaining warranties to the desired effect. If the seller is willing to give such assurances, however, he will ordinarily insist upon additional compensation. Rather than pay more, a buyer may choose to rely entirely upon his own determination of the condition and value of his purchase. In making this choice, he removes the possibility that the seller's conduct will cause him damage.

*Id.* at 161.

The validity of an "as is" agreement is determined in light of the sophistication of the parties, the terms of the "as is" agreement, whether the "as is" clause is freely negotiated, whether it was an arm's length transaction, and whether there was a knowing misrepresentation or concealment of a known fact. *Id.* at 160–62. From the facts contained in appellees' summary judgment proof as set out above, the record supports the conclusion that the contract was negotiated by parties of equal bargaining strength in an arm's length transaction. Indeed, Procter, in his affidavit contained in the summary judgment response, admits that he is president of appellant-College Street, Ltd., and is familiar with the valuation of income producing rental properties. Furthermore, as noted above, Procter was represented by

legal counsel during the pendency of the negotiating process.

In examining the terms of the "as is" clause in the contract, it is clear that by its comprehensive language, the buyer explicitly agreed to completely release the seller from virtually every conceivable liability-producing act, omission, or event with regard to the property in question. Certain of this release language was emphasized by capitalizing the words so that there could be no confusion as to the far-reaching extent of the release of liability to which Procter was agreeing. For example, Procter explicitly agreed to purchase the property "AS IS, WHERE IS, AND WITH ALL FAULTS[,]" and further explicitly agreed that appellees did not make any "REPRESENTATIONS, EXPRESS OR IMPLIED" with respect to the "VALUE, PROFITABILITY OR MARKETABILITY OF THE PROPERTY[.]" In another paragraph, Procter further explicitly "WAIVES, RELEASES, AND DISCHARGES" any claim he may have, past, present, or future, with respect to "the actual or potential income or profits to be derived from the Property[.]"

We have no choice but to conclude that the "as is" clause in the instant contract fully satisfied the requirements, both in letter and in spirit, set out and discussed in *Prudential.* The "as is" clause conclusively negates the reliance element that is essential to recovery on all theories Procter alleged in his petition. This does not end the inquiry, however, as Procter, in his summary judgment response, raised the issue of fraudulent inducement.

In *Prudential,* the Court was not faced with the issue of "fraudulent inducement" as the buyer did not allege that as one of the bases in his underlying lawsuit against the seller. *See Prudential,* 896 S.W.2d at 161. In what can be described, therefore, as authoritative dicta, the Court

goes on to discuss under what circumstances a buyer is not bound to purchase something "as is" simply because the written contract for sale explicitly and clearly sets out that he has done just that. If a buyer can show fraudulent misrepresentation or concealment of information on the part of the seller, the "as is" clause would not be binding. *Id.* at 162. In the context of a summary judgment proceeding, it has been observed that proof of "fraudulent inducement" is in the nature of a counter-defense. *See Larsen v. Carlene Langford & Assoc., Inc.,* 41 S.W.3d 245, 253 (Tex. App.—Waco 2001, n.pet.h.). While we are not certain that such a showing by a non-movant/buyer is a "counter-defense" or merely summary judgment response to the movant/seller's affirmative proof negating the reliance element of the buyer's cause of action, we do agree with the Waco Court that once the seller has conclusively negated the reliance element, the buyer, in order to avoid summary judgment, must present some summary judgment evidence that "but for" the representations of the seller regarding the condition of the subject of the contract, the buyer would not have assented to the "as is" clause in the sales' contract. *Id.* Specifically, the buyer's summary judgment response evidence must raise a fact issue on each element of a common law fraud claim based upon those specific representations of the condition of the subject of the contract. *Id.* Citing *Fletcher v. Edwards,* 26 S.W.3d 66, 77 (Tex.App.—Waco 2000, pet. denied). The elements of common law fraud are:

(1) a material representation;

(2) which was false;

(3) which was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth;

(4) which was intended to be relied upon;

(5) which was relied upon; and

(6) which caused injury.

*Id.*

Appellants' evidentiary attachments begin with an affidavit from Doak Procter, III. The affidavit contains 15 factual assertions on Procter's part. We reproduce the more salient paragraphs below:[1]

3. I have reviewed the defendants' motion for summary judgment, along with all exhibits, including the contract of sale, affidavit of Worth Williams and affidavit of Gerald Richardson.

4. On February 6(sic), 1998, I entered into a contract on behalf of College Street, Ltd. to purchase certain income producing rental properties located in a strip center on College Street, Beaumont, Texas from RMC Capital Corporation, RMC Properties I, Ltd., and RMC Genpar I, Inc. Catherine Cox Mullen and C. Mitchell Cox are members, officers, partners or joint venturers in these entities.

5. As part of the information supplied to plaintiffs by the defendants before the purchase, I received documents and lease agreements reflecting that Cox Video Corporation had entered into a lease with Romica, Inc. pursuant to which it paid $4,500 per month rental. A successor lease agreement had also been entered into which would become effective on January 1, 1999 for a three year period. It provided for rentals of $4,950 per month (Exhibit "B"). In addition, Cox was required by the leases to pay its pro rata portion of property taxes attributable to its leased space.

6. Cox Video Corporation was owned by Catherine Cox Mullen and C. Mitchell Cox's father, Robert W. Cox, Sr.

Robert W. Cox, Sr. was party to a consulting agreement with Romica, Inc., a corporation owned by Catherine Cox Mullen and C. Mitchell Cox (Exhibit "C"). Romica, Inc. held legal title to the property.

7. The Cox Video Corporation leases comprised a substantial portion of the fair market value of the property.

8. Because of the proportionate size of the lease, I was concerned about the financial viability of Cox Video Corporation. After specifically directing inquiries to defendants and their broker, Gerald Richardson, I was provided by Gerald Richardson, acting on behalf of the defendants, a financial statement of Cox Video Corporation which reflected that it was in good financial shape and was capable of funding the lease payments (Exhibit "D").

9. College Street, Ltd. and I reasonably relied upon the financial information and the leases in making the decision to purchase the property for $1,125,000. In arriving at this valuation of the property, we relied upon the value of the Cox Video leases.

10. After closing of the sale and purchase, Cox Video Corporation fell into arrears on its lease payments and defaulted under the terms of the lease. It also filed bankruptcy proceedings.

. . . .

12. Cox Video Corporation did not pay rent from October of 1998 until September of 1999, when the property was relet to two tenants, Prestige Furniture Rental and Eagle Charter School. Attached is a true and correct copy of a summary of the account and outstanding debt of Cox Video (Exhibit "E"). Cox did not pay $51,319.62 in rent, after all offsets

---

1. References to the company "Romica, Inc." are merely references to the business entity that appellees Mullen and C. Mitchell Cox owned and did business under at one time. Appellee–RMC Capital Corporation was apparently Romica's successor by merger.

and reductions. In addition, Cox failed to pay $11,138.50 in property taxes owed under the lease, which amount was paid by the plaintiffs. We were also required to expend $3,504.95 in reasonable and necessary legal fees in the Cox Video bankruptcy proceedings.

. . . .

14. It is a fact that we have entered into additional leases on other portions of the property which arguably have increased the total fair market value of the property. The leases are the result of the expenditure of funds and efforts by the plaintiffs in this case. The fact that we have been able to enter into these leases does not negate the fact that the Cox Video bankruptcy resulted in a diminished fair market value of the property.

15. The plaintiffs, in fact, did reasonably rely upon the financial statements and leases provided by the defendants and their broker, Gerald Richardson.

■ We have carefully examined Procter's affidavit and find it does not indicate what information or representations supplied by appellees were false. Significantly omitted from Procter's affidavit are the dates of certain events he was involved in. For example, recall that the date reflected on the Cox Video Corporation financial statement is "March 31, 1997." This reflected the financial viability of Cox Video Corporation on or about that date. Yet, by appellants' own evidence, the first sign of financial trouble from Cox Video Corporation was the default of the October 1998, rent payment. Simple mathematics indicates that Cox Video Corporation, by appellants' own evidence, had financial viability for some 18 months. The last seven of those months, Cox Video was apparently making the rent payments to appellants in full and in timely fashion.

Additionally, the initial lease agreement between Cox Video Corporation and Romi-

ca Corp. reflects that it was entered into in July of 1991, for the specified term beginning "September 15, 1991," and ending "December 31, 1998." The new lease, which took effect "January 1, 1999," and was to end "December 31, 2001," was signed by C. Mitchell Cox for Romica Corp. on January 19, 1998, and signed by Robert W. Cox for Cox Video Corporation on January 2, 1998. Appellants do not explain what information contained in either of the two lease agreements or in the March 31, 1997, Cox Video financial statement is false. Indeed, on their face, the leases appear to be standard lease agreements. Procter's affidavit does not indicate that any verbal representations were made to him with regard to any of the three documents upon which he and College Street, Ltd. reasonably relied. Taking all three documents together prior to his execution of the sale's contract on February 4, 1998, Procter would have had knowledge that Cox Video Corporation's financial viability appeared sound on paper *as of one year before*, and that he could reasonably infer that Cox Video Corporation was still financially viable because of the January 1998, execution of the new lease agreement which increased the monthly rent Cox Video was to pay to appellants. This inference was indeed borne out by the fact that Cox Video Corporation continued to pay monthly rent after appellants took over as owners from March of 1998 through September of 1998. We engage in these inferences because the documents in the record before us reasonably allow for no other. Appellants simply have not provided a shred of evidence to indicate what false information was contained in the leases or the financial statement or what representation was made by appellees with regard to these documents that was false, untrue, or misleading. Furthermore, by his own affidavit, the information contained in the leases and the financial statement were the only things

Procter relied on. Certainly, the March 15, 1997, financial statement of Cox Video Corporation indicated that it was "in good financial shape and was capable of funding the lease payments." Why Procter did not request an updated financial statement of Cox Video Corporation in January or February of 1998, prior to executing the sale's contract, is not reflected in the record. We are further not enlightened as to the significance, for purposes of showing fraud in the inducement to execute the release, of the independent consulting agreement between Romica Corp. and Robert W. Cox. The document indicates that it was executed by C. Mitchell Cox and Robert W. Cox on November 1, 1993. This was well prior to appellants' involvement with appellees as regards the property sale in question.

We find that appellants have failed to provide summary judgment proof establishing at least a fact issue on each element of common law fraud so as to avoid summary judgment in favor of appellees, who negated reliance as a matter of law. Appellants having failed this, we affirm the trial court's summary judgment in favor of appellees.

AFFIRMED.