# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00525-CV

**Henry Neal, Appellant**

**v.**

**Wayne Guidry and Kat Guidry, Appellees**

## FROM COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY
## NO. 13-0776C, THE HONORABLE DAVID GLICKLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from the judgment of the county court at law of Hays County in a breach-of-contract suit. Upon trial to a jury, the court rendered judgment for appellees Wayne and Kat Guidry for $38,000. Appellant is Henry Neal. We will reverse the judgment and remand the cause for new trial.

Wayne Guidry inherited from his father a large and diverse assortment of items (the collection) including military medals and Native American relics. Among the medals were three Congressional Medals of Honor; the collection also contained thousands of arrowheads.

Pursuant to a written contract, Neal bought the collection for $90,000. He made a $40,000 down payment but refused further payment. Guidry filed suit to recover the balance. Neal answered, pleading, among other things, that the contract was illegal and that he was induced to enter into the contract by Guidry's fraudulent representations or concealment of information.

Neal first met Guidry in November 2012 at Guidry's garage sale. After Neal appeared interested in some of the pieces in the garage sale, Guidry showed him the collection. When Neal inquired whether he would sell the whole collection, Guidry replied that he might at a later date but that he was then too busy taking care of his mother. After Guidry's mother died, he telephoned Neal that he was able to sell the collection. In April 2013, Neal again viewed the collection, including the three Congressional Medals of Honor. Guidry's asking price for the collection was $200,000, although he told Neal that he could have it for $150,000.

In May 2013, Neal returned to see the collection, bringing with him his financier, Terry Verburgt. Guidry again showed the Congressional Medals of Honor, emphasizing their monetary value. Verburgt testified that Guidry told them that each medal could be worth up to $7,000 and that these medals were being sold along with everything else in the collection.

Federal law prohibits the sale of Congressional Medals of Honor. *See* 18 U.S.C.A. § 704(a), (c). Although Neal claimed to be unaware of the prohibition, Guidry knew that it was illegal to sell them. Guidry claimed at trial that he told Neal that these medals could not be sold but that he was giving them to him because he was buying the whole collection.

At the May visit, Neal and his party spent several hours looking through the collection and listening to Guidry describe the collection and its origins. Guidry claimed that his family, including his grandfather, father, and himself, had personally dug up all of the Native American artifacts and that he had family records and photographs to document his claim. In truth, at least 30 to 40 percent of the arrowheads in the collection were not dug up by his family, but instead were purchased by his father from dealers in Arkansas and Missouri. Guidry had in fact accompanied his father on several such buying trips. The dealers did not furnish any certificates of authenticity of the arrowheads.

2

After the May visit, Neal bargained with Guidry for the collection. Neal asked if Guidry would drop the price to $110,000. Guidry agreed. Later in May, Neal returned to Guidry's house to pick up the collection and make a $40,000 down payment. Verburgt and two other men came with him to help load the collection. It took most of the day to load everything in Verburgt's truck and trailer. The Congressional Medals of Honor were included in the items that Neal received. No one heard Guidry say that those medals were being gifted, not sold, to Neal.

After taking possession of the collection, Neal showed a few of the arrowheads to a local arrowhead "expert," Rob Bartell. Bartell's opinion was that some of the arrowheads were "possibly good, some definitely not good" and some had been retipped. "Retips" are arrowheads reworked by "knapping." Flint knapping is the process for making arrowheads. Also, if an authentic arrowhead is broken or imperfect, it may be reshaped (retipped) by knapping to make it perfect. Retipping drastically reduces the value of an arrowhead. Neal visited with Guidry concerning Bartell's opinion of the authenticity of the few arrowheads that he had examined. Guidry "strongly disagreed" with Bartell's evaluation, but agreed to drop the sales price for the collection to $90,000.

At this point, however, Guidry wanted a written contract to make certain that there would be no more renegotiations of the sales price. Guidry's wife drafted the contract which Neal signed on June 18, 2013. Neal testified that he did not discover until some weeks later that the Congressional Medals of Honor could not be sold. At that time, he telephoned Guidry telling him the medals could not be sold and requesting him to take back the collection and "call off the deal." Guidry refused.

Meanwhile, Bartell, the arrowhead expert, finished going through the "mountain" of arrowheads. He found that there were massive quantities of valueless retips, literally "bins full of them." One witness described the retips as just "sharp rocks" as opposed to valuable artifacts. From the entire batch of arrowheads in the collection, only a few were certified as authentic. Guidry never furnished any family records or photographs documenting his claims that his family had dug up the artifacts, nor did he produce the promised "paper trail" showing where his father obtained the arrowheads.

After Guidry refused to take back the collection, Neal and Verburgt auctioned off all the items of value in the collection for $36,000.

At trial, the parties agreed that Neal failed to comply with the June 18 contract by refusing to pay the balance due. The parties also stipulated that the value of the Congressional Medals of Honor was $12,000. The disputed issues were submitted to the jury. Among other things, the jury found that the Congressional Medals of Honor were sold by Guidry to Neal and were memorialized in the June 18 contract. The jury also found that Neal's failure to comply with the contract damaged Guidry in the sum of $50,000.

Everyone agreed that the Congressional Medals could not be legally sold, and since the jury determined that those medals were included in the parties' contract of sale, Neal insisted that the trial court declare the entire contract void. Instead, the court severed out the invalid part of the contract involving sale of the Congressional Medals of Honor and rendered judgment for Guidry for $38,000.

By his first issue, Neal asserts that because a part of the consideration for the parties' contract of sale included the Congressional Medals of Honor, the trial court erred in failing to declare the entire contract void. We do not agree.

4

"A contract illegal in part and legal as to the residue is void as to all, when the parts cannot be separated; when they can be, the good will stand and the rest will fall." *Raywood Rice Canal & Milling Co. v. Erp*, 146 S.W. 155, 159 (Tex. 1912); *Redgrave v. Wilkinson*, 208 S.W.2d 150, 152 (Tex. App.—Waco 1948, writ ref'd n.r.e.); *Dietz v. Van Nortwick*, 188 S.W.2d 590, 591 (Tex. App.—Galveston 1945, writ ref'd w.o.m.)

The sale of the Congressional Medals of Honor was separable from the many other items in the collection because their value was agreed upon. Accordingly, the court properly severed out the illegal portion of the contract and permitted the balance to stand.

Neal argues next that the court erred in refusing to submit his requested fraud-in-the-inducement question.[1] We agree. In response to Guidry's claim, Neal pleaded fraud in the

---

[1] QUESTION ____
Failure to comply by HENRY NEAL is excused if the following circumstances occurred:

1. WAYNE GUIDRY

    a. by words or conduct made a false representation or concealed material facts, and

    b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

    c. with the intention that HENRY NEAL would rely on the false representation or concealment in acting or deciding not to act; and

2. HENRY NEAL

    a. did not know and had no means of knowing the real facts and

    b. relied to his detriment on the false representation or concealment of material facts.

Was HENRY NEAL's failure to comply excused?

inducement as an affirmative defense. A contract is subject to avoidance on the ground of fraudulent inducement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).

At the close of the evidence and after the parties had rested, the court conducted a jury-charge conference. At the conference, Neal tendered his fraud-in-the-inducement question. The court denied the tendered question, stating, "Now in the proposed question about—this is I guess the affirmative defense based on a false representation or concealed facts? . . . All right. The request for this instruction [sic] is denied." The court and Neal's counsel then discussed the tendered question on the record for several pages. At the conclusion of the charge conference, the court informed counsel that formal objections to the charge would be made after the jury had begun its deliberations.

The following morning the court again declared that objections to the charge would be made after the jury had begun deliberations. In response to counsels' inquiries concerning waiver, the court declared that both Guidry and Neal could make their objections to the charge after jury deliberations began without waiver. Accordingly, at the time allotted by the court, Neal's counsel again tendered the fraud-in-the-inducement question. The court then signed the tendered question and wrote "denied" thereon.

Guidry argues that Neal failed to timely preserve error. We disagree. More than twenty-five years ago, the Texas Supreme Court announced what the test should be for

---

Answer "Yes" or "No."

Answer: _____

6

determining whether a party has preserved error in the court's charge. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). The Court observed, "There should be one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to save rather than defeat this principle." *Id.* Since *Payne*, the Court has several times emphasized its holding in connection with the timing of objections and wording of requests, asserting that intermediate courts should be concerned about common sense and not promote form over substance. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000); *Dallas Mkt. Ctr. Dev. Co. v. Liedeker*, 958 S.W.2d 382, 386 (Tex. 1997) (per curiam), *overruled in part on other grounds by Torrington*, 46 S.W. 3d at 840 n.9; *Alaniz v. Jones & Neuse, Inc.* 907 S.W.2d 450, 451–52 (Tex. 1995); *Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 637–38 (Tex. 1995).

Neal timely preserved error at the charge conference by tendering the fraud-in-the inducement question and by obtaining a ruling. The court was reasonably aware of Neal's complaint as evidenced by the court's on-the-record comments and the extended on-the-record colloquy between the court and Neal's counsel. This Court, following the reasoning of *Payne*, concludes that Neal did not waive his complaint to the court's charge.

There is an alternate reason that Neal preserved error. This is not a case where the parties agreed to submit objections after the charge was read and the court consented to the parties' agreement. *See Missouri Pac. R.R. Co. v. Cross*, 501 S.W.2d 868, 873 (Tex. 1973). Rather, the court here directed the parties to state their objections after the charge was read and the jury had begun its deliberation, and the court even pronounced that neither party had waived

7

objections to the court's charge by complying with its directive. Common sense mandates that a party, compelled by the court's ruling to state its objections to the charge after the jury has begun its deliberations, does not waive its complaint. *See Alaniz*, 907 S.W.2d at 451–52.

Guidry next argues that Neal's tendered question was not "substantially correct" because it did not contain the following element: "a promise of future performance made with no intention to perform." Tex. R. Civ. P. 278. Guidry suggests, incorrectly, that "a promise of future performance made with no intention to perform" is a separate required element in all fraudulent-inducement submissions. To the contrary, inclusion of such an element depends upon the facts of the case. For example, antecedent fraud, as here claimed, is a defense to the enforcement of a contract. *See Prudential Ins. Co. of Am. v Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). The required elements of the defense of fraudulent inducement are (1) the defendant "made a material representation"; (2) the defendant's "representation was false and was either known to be false when made or made without knowledge of its truth"; (3) the defendant's "representation was intended to be and was relied upon by the injured party"; and (4) the "injury complained of was caused by the reliance." *National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015) (citing *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009).

In sum, Neal's tendered question was "substantially correct" under the facts of this case. *See* Tex. R. Civ. P. 278.

Finally, Guidry argues that even if the court erred in failing to submit Neal's question on fraudulent inducement, such error was not reversible error in view of Neal's own

investigation of the collection. Guidry claims that Neal's fraudulent-inducement defense fails because Neal began investigating some aspects of the collection before signing the June 18 contract and that Neal's investigation negated, as a matter of law, the elements of reliance and causation necessary to prove fraudulent inducement. The rule is that one cannot recover for fraudulent misrepresentation when he knows that the representation is false or when he has relied solely on his own investigation rather than on the representations of the other party. *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 308 (Tex. App.—Texarkana 1992, *vacated and remanded by* 840 S.W.2d 384 (Tex. 1992) ("The judgments of the court of appeals, 829 S.W.2d 300, and the trial court are set aside without reference to the merits, and the cause is remanded to the trial court for entry of judgment in accordance with the settlement agreement of the parties."). Neal's only precontractual investigation consisted of the following: after Neal took possession of the collection, but before the June 18 contract was signed, Neal showed a few of the arrowheads to Rob Bartell, a local arrowhead expert. Bartell was of the view that some of the arrowheads had been retipped. When Neal brought this matter up with Guidry, Guidry strongly disagreed. Neal's precontractual investigation, however, had nothing to do with the facts underlying his fraudulent-inducement defense.

Neal's fraud-in-the-inducement defense was based on Guidry's claimed material misrepresentations regarding two issues: (1) whether the Medals of Honor were quite valuable or, instead, illegal to sell; and (2) whether the Native American artifacts had been personally dug up by Guidry's father and family at known Native American "locations" that could be documented by family records and photographs or, instead, 30 to 40 percent of the arrowheads had been purchased by Guidry's father from dealers without records or source documentation of authenticity. Guidry has not pointed the Court to any "independent investigation" by Neal

9

concerning either of these issues before the June 18 contract was signed.  It is plain, of course, that if a buyer has not investigated the particular representation that turns out to be fraudulent, he cannot be relying on his own investigation and may still be able to show his reliance on the seller's misrepresentation.

The judgment is reversed, and the cause is remanded for new trial.

_____

Bob E. Shannon, Justice

Before Justices Baker, Smith, and Shannon*

Reversed and Remanded

Filed:   May15, 2019

*  Before Bob E. Shannon, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).

10