

# IN THE
# TENTH COURT OF APPEALS

———————————

### No. 10-05-00066-CV

———————————

**PASSAT LAUNDRY SYSTEMS, INC.,
PASSAT CORPORATION, BOWE PERMAC, INC.
A/K/A PASSAT LAUNDRY SYSTEMS, INC.,
F/K/A BOEWE-PASSAT DRYCLEANING
AND LAUNDRY MACHINERY CORPORATION,**

Appellants

**v.**

**FLAKE INDUSTRIAL SERVICES, INC.,**

Appellee

———————————

**From the 89th District Court
Wichita County, Texas
Trial Court No. 148,943-C**

———————————

## MEMORANDUM OPINION

———————————

Flake Industrial Services (Flake) sued Passat Laundry Systems (Passat) for damages in connection with an Ultra Tandem UT-45 Continuous Batch Washer and related equipment (the system), which it had purchased and was installed in its Wichita Falls plant. Trial was to the court, which rendered judgment for Flake. Passat now challenges the legal and factual sufficiency of the trial court's findings and the damages calculation.

## BACKGROUND

In the early 1990s, Passat developed a new series of tunnel washers, the Ultra Tandem series, which were able to perform different wash functions simultaneously. The first of the Ultra Tandem machines, the UT-20, was installed in Flake's commercial laundry plant in March 1990 so that Passat could test the machine within a normal industry environment. In consideration, Passat agreed to allow Flake to use the "prototype" UT-20 or "a replacement Passat prototype 40 KG" machine for a limited time without charge. Passat and Flake entered into an Equipment Purchase and Sale Agreement effective December 31, 1990, which recited this agreement and documented the purchase of a two-stage press, a batch dryer, and a shuttle conveyor. This contract contained a statement that the equipment was sold "AS IS" with no implied warranties and provided for an express twelve-month warranty on the press, dryer, and shuttle conveyor.

On July 1, 1991, Passat replaced the UT-20 with a UT-45 Batch Washer, the larger washer intended as the replacement in the first contract. In December of 1992, Bob Montgomery, a Passat salesman, and Leon Flake, CEO of Flake, negotiated the terms and executed the Second Equipment Purchase and Sale Agreement. Under this agreement, Flake agreed to purchase the UT-45 and a single-stage press. Leon Flake and Bob Montgomery testified at trial that during the negotiation process Bob Montgomery stated that equipment of the UT-45's nature has a life expectancy in the industry of fifteen to twenty years. This contract also provided that the equipment was sold "AS IS" with no implied warranties. The contract did not include the fifteen to twenty year representation. However, it provided that the structural components of the UT-45 would be free from defects in material and workmanship through May 15, 1998 and provided shorter warranties for other parts. This contract stated that after the

expiration of the warranties, "there shall be no further express or implied warranties of any kind with respect to the UT-45 Batch Washer." In addition, the contract provided a merger clause which stated that the second contract, together with the first contract, contained the entire understanding of the parties and superseded all prior agreements, arrangements, and understandings, whether written or oral.

In August 1997, the UT-45 malfunctioned and no longer properly transferred loads of laundry. Flake's maintenance supervisor discovered cracks in the machine's interior drum. In September, Andy Baldwin, a Passat service technician, inspected the UT-45 and determined that the last two compartments of the UT-45 needed to be replaced. However, Baldwin's report indicated that there were only small cracks in certain compartments of the machine. The parties corresponded throughout September and October about the possible methods of repairing the cracks. Flake maintained that welding the cracks in the UT-45 was not acceptable. Passat stated in a letter to Flake that it intended to fulfill all contractual commitments made pursuant to the Second Equipment Purchase and Sale Agreement. However, Passat failed to make satisfactory repairs or to provide replacement parts.

Flake filed suit against Passat on December 23, 1997 and stated claims for breach of contract, breach of express warranty, breach of the implied warranties of merchantability and fitness for a particular purpose, and misrepresentations under the Texas Deceptive Trade Practices Act.

**ISSUES**

The trial court entered Findings of Fact and Conclusions of Law. Passat challenges the legal and factual sufficiency of the following findings: (1) Passat's statement that the Tandem System would last fifteen to twenty years was an actionable representation; (2) Passat represented that the entire Ultra Tandem System would last fifteen to twenty years; (3) Passat breached the second contract and its warranty provision; (4) Passat breached an implied warranty; (5) Flake relied to its detriment on any false, misleading or deceptive acts or omissions; and (6) Passat's representations and omissions, or breaches of express and implied warranties, were a producing cause of Flake's damages. Passat also challenges the factual sufficiency of the finding that Passat failed to disclose that the UT-45 was an experimental machine. Finally, Passat challenges the trial court's damages calculations.

**STANDARD OF REVIEW**

Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991). When challenged on appeal, the findings are not conclusive on the appellate court if there is a complete reporter's record, as there is here. *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex. 1987); *In re K.R.P.,* 80 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Those findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answers. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994); *Dominguez v. Castaneda,* 163 S.W.3d 318, 325 (Tex. App.—El Paso 2005, pet. denied). Generally, we will not disturb a trial court's findings if there is evidence of probative force to support them. *See Ski River Dev., Inc. v. McCalla,* 167 S.W.3d

131, 136-37 (Tex. App.—Waco 2005, pet. denied); *Barrientos v. Nava,* 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Therefore, in conducting a legal sufficiency review, we will view the evidence in the light most favorable to the trial court's findings and indulge every reasonable inference that supports it. *City of Keller v. Wilson,* 168 S.W.3d 802, 821 (Tex. 2005). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* If the evidence falls within a "zone of reasonable disagreement," we cannot substitute our judgment for that of the trier-of-fact. *See id.* at 822.

In reviewing a factual sufficiency issue, we consider all the evidence, whether it supports or is contrary to the finding. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003). Reversal could occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. *Checker Bag Co. v. Washington,* 27 S.W.3d 625, 633 (Tex. App.—Waco 2000, pet denied) (citing William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L. REV. 515, 519 n.11 (1991)). We set aside the finding based on factual insufficiency only if the evidence supporting the finding is so contrary to the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998).

We review the trial court's conclusions of law *de novo*. *Dominguez,* 163 S.W.3d at 325. Under *de novo* review, the reviewing court exercises its own judgment and redetermines each legal issue. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex. 1998).

## "AS IS" Agreement

Proof of causation is essential for recovery on Flake's DTPA and breach of warranty causes of action. TEX. BUS. & COM. CODE ANN. §17.50(a) (Vernon Supp. 2005). Passat argues that the "as is" clause in the contract precludes Flake from proving Passat caused it harm. Flake argues that Passat failed to plead the "as is" clause as an affirmative defense to its DTPA claims and therefore the issue is not before us. Flake failed to cite any authority that requires an "as is" clause to be pled as an affirmative defense. Regardless, the issue was tried by consent. The "as is" clause is a significant issue because if the "as is" clause in the second contract is valid, legally sufficient evidence will not exist to show that Passat caused Flake damages and Flake will not recover on its DTPA and breach of warranty claims. *City of Keller,* 168 S.W.3d at 820.

"The validity of an 'as is' agreement is determined in light of the sophistication of the parties, the terms of the 'as is' agreement, whether the 'as is' clause is freely negotiated, whether it was an arm's length transaction, and whether there was a knowing misrepresentation or concealment of a known fact." *Larsen v. Langford,* 41 S.W.3d 245, 252 (Tex. App.—Waco 2001, pet. denied) (citing *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 160-62 (Tex. 1995)).

Throughout his career, Bob Montgomery has worked for two commercial laundry manufacturers and, at the time of negotiating the present contract, had approximately thirteen year's experience selling commercial laundry equipment and negotiating sales. Leon Flake is the CEO of Flake Industrial Services and testified that he had been in the laundry business for fifty years and had experience in negotiating equipment purchase agreements. Further, the parties had experience negotiating with each other in the past. Before negotiating the sale of the UT-45, Montgomery was involved in the sale of about a dozen pieces of equipment to Flake. Both

individuals had experience in the industry and with commercial laundry equipment. There is evidence that the parties were similarly knowledgeable and sophisticated in this industry.

In *Prudential,* the court stated that in determining the validity of an "as is" clause, a reviewing court must also look to the terms of the agreement itself. The terms of the agreement in *Prudential* stated that the purchaser agreed to take the property "as is" with any and all latent and patent defects. *Prudential,* 896 S.W.2d at 160. The *Prudential* agreement also stated that the purchaser acknowledged that it was relying upon its own examination of the property. *Id.* The terms of the present agreement state that the equipment was purchased and sold in an "AS IS" condition with no implied warranties of any kind, including, without limitation, any implied warranties of merchantability or fitness for a particular purpose. It is not necessary that the terms of an "as is" agreement be as specific as the *Prudential* terms if the contract leaves no doubt exactly what the parties agreed to. *Larsen,* 41 S.W.3d at 252. By signing the agreement with the "as is" language, agreeing to accept the equipment without any implied warranties, and signing the agreement with a merger clause which stated that the written contracts contained the entire understanding of the parties, this contract left no doubt that Flake intended to rely solely on the statements in the contract.

The evidence presented further shows that Montgomery and Flake actively negotiated the terms of the contract and conducted this transaction at arm's length. Handwritten changes were made to the agreement including changes to the express warranty provisions. Further, Montgomery testified that Leon Flake actively negotiated the contract. Looking at the totality of circumstances, the evidence shows that Flake agreed to make its own appraisal of the bargain and accepted the risk that it might be wrong. *Prudential,* 896 S.W.2d at 161. We hold the

agreement between the parties contained a valid "as is" clause which negates causation unless Flake established that it was fraudulently induced to enter the agreement.

## Fraudulent Inducement

An otherwise valid "as is" agreement will not negate the causation element of a DTPA or a breach of warranty claim if the buyer can prove fraudulent inducement such as a knowing misrepresentation or concealment of a known fact. *Id.* at 162. In order to prove fraudulent inducement, evidence must exist for each element of a simple fraud claim. *Fletcher v. Edwards,* 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. ref'd). The elements of simple fraud are:

(1) a material representation;
(2) which is false;
(3) which was known to be false when made or was made recklessly as a positive assertion without knowledge of its truth;
(4) which was intended to be relied upon;
(5) which was relied upon; and
(6) which caused injury.

*Id.* Flake argues Passat represented that the UT-45 had a life expectancy of fifteen to twenty years. Montgomery testified that during negotiations with Leon Flake he stated that equipment of the nature of the UT-45 generally has a life expectancy of fifteen to twenty years. Flake did not present evidence of the life expectancy of commercial laundry equipment to contradict this representation. Further, Montgomery testified that to his knowledge his statement was correct at the time of the negotiations. Flake has not presented evidence that Montgomery's statements were false when made or made recklessly;[1] therefore, the "as is" clause in the agreement is valid and negates the causation element of Flake's DTPA and breach of warranty claims. We sustain issue one, in part.

## Failure to Disclose

---

[1] We also believe that the reliance element fails. The system had been in use by Flake for a year and a half and Flake had extensive experience with Passat's equipment line.

In its second issue, Passat challenges the factual sufficiency of the evidence to support the trial court's finding that Passat failed to disclose the UT-45 was an experimental machine. In viewing all the evidence, we must set aside this finding. The first contract executed by the parties in December 1990 clearly stated that the UT-20 and its replacement were "prototypes." Further, Bob Montgomery testified that he "made it known to Flake" that the progression of the batch washer was to be larger capacity machines and referred to the replacement UT-45 as a "future model." Coupled with Leon Flake's significant experience in the industry, these facts indicate that Flake was aware that Passat viewed the UT-45 as an experimental machine. Therefore, we sustain issue two and we must remand to the trial court the issue of whether the failure to disclose that the UT-45 was experimental fraudulently induced Flake to enter the agreement with Passat so as to negate the "as is" clause in the agreement.[2]

**Alternative Findings**

The fact that the trial court's DTPA and breach of warranty findings are not supported by legally sufficient evidence does not end our inquiry. When a party obtains favorable findings on alternative theories, it may obtain judgment on the theory entitling it to the greatest or most favorable relief. *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex. 1995); *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex. 1988). If the judgment is reversed on appeal, the appellate court should consider all alternative theories and render judgment on the theory granting the next highest award of damages that can be rendered from the pleadings, evidence, and verdict. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002)

---

[2]    Passat challenges only the factual sufficiency and not the legal sufficiency of the failure-to-disclose finding.

(citing *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex. 1987)). Thus, we will determine if Flake may recover under the trial court's findings supporting a breach of contract.

**Sufficiency of Breach of Contract Finding**

Passat asserts there is no legally or factually sufficient evidence to support the trial court's finding that Passat breached the warranty provision of the sales contract. The agreement provided that during the express warranty period, Passat would repair the UT-45 or provide replacement parts and diagnose problems with the machine. At trial, Flake presented evidence that Andy Baldwin, a Passat technician, inspected the UT-45 and determined that two of its compartments needed to be replaced. The evidence showed that although this diagnosis was not indicated in Baldwin's service report, it was made known to Passat by Flake. Further, as early as August 1997 Passat was aware that the UT-45 was in need of repair or replacement parts. As of December 1997, Passat had failed to provide repair or replacement parts. We hold this evidence to be legally and factually sufficient to support the trial court's finding that Passat breached the warranty provision of the contract. We overrule issue one as to this claim.

**Damages**

The general rule for measuring damages for breach of contract is "just compensation for the loss or damage actually sustained." *Stewart v. Basey,* 245 S.W.2d 484, 486 (1952). Damages for breach of contract protect restitution interests, reliance interests, and expectation interests. *Qaddura v. Indo-European Foods, Inc.,* 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, pet. denied) (citing *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex. App.—San Antonio 1998, pet. denied)). The most common interest protected is the expectation or benefit-of-the-bargain interest. *Id.* In this case, to protect the expectation interest, the measure of damages is the reasonable cost to repair the UT-45. The trial court found that amount to be

$50,000, which we find to be supported by legally and factually sufficient evidence.  Flake is also entitled to recover attorney's fees, which the trial court found to be $29,317.50.  TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1997).

We overrule issues three, four, and five.

## CONCLUSION

For the reasons stated, the judgment of the trial court is reversed, and we remand to the

trial court for further proceedings consistent with this opinion.


                                        BILL VANCE
                                        Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
Reversed and rendered
Opinion delivered and filed March 15, 2006
[CV06]