

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00043-CV

_____

CORNELIUS JOE ERGONIS AND LINDA ANN ERGONIS, Appellants

V.

WILLIAM THOMAS SULTZBAUGH, SHARON ELLIOTT SULTZBAUGH A/K/A SHARON CARR, EBBY HALLIDAY REAL ESTATE, INC., KATHY GIBSON, PAUL WOOD INSPECTION GROUP, INC., CALEB WOOD, AND JAMES ALAN PETERSON, Appellees

---

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. 19-5640-362

---

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Within two years of buying a luxury golf-course home for around $1.2 million, Appellants Cornelius Joe and Linda Ann Ergonis (the Buyers) sued—and sought $2.9 million to demolish the home "to the studs" and rebuild it from—Appellees William Thomas and Sharon Elliott Sultzbaugh a/k/a Sharon Carr (the Sellers); Appellees Ebby Halliday Real Estate, Inc. and Kathy Gibson (collectively, the Sellers' Agent); and Appellees Paul Wood Inspection Group, Inc.; Caleb Wood; and James Alan Peterson (collectively, the Buyers' Inspectors). Under various legal theories, the Buyers claimed that the Sellers and their Agent had not disclosed, and that the Inspectors had failed to identify, certain information about the home's foundation and structure.

The Sellers, the Sellers' Agent, and the Inspectors each moved for summary judgment. Among other things, the Sellers and their Agent argued that the Buyers signed an "as is" contract, knew of the complained-of defects, and hired their own inspectors. The Inspectors argued that their damages were contractually limited to $1,299—the inspection fee.

The trial court granted the motions and signed a final judgment (1) adjudging that the Buyers take nothing but the $1,299 that the Inspectors had deposited into the court's registry after conditionally stipulating to liability and (2) awarding the Sellers and their Agent their attorneys' fees, expenses, and costs. In three appellate issues, the

Buyers complain that the trial court erred by granting each summary-judgment motion. We will affirm.

## I. Background Facts

### A. The Sellers prepared to sell their home.

The Sellers owned an over-6,600-square-foot home located in Frisco, Texas. Built in 1988, the home had two stories and a pier-and-beam foundation.

In 2014, the Sellers hired TCS Engineering LLC to inspect the home's foundation and recommend repairs. According to TCS, the home's first floor was not level within normal standards, and "bowed wooden floor stringer beams" were causing "floor depressions." A few weeks later, the Sellers engaged Power Lift Foundation Repair, Inc. to make TCS's recommended repairs.

In 2016, the Sellers hired Jensen Engineering to inspect their home, and Jensen also documented "differential foundation movement and related structural distress." In an April 13, 2016 report, Jensen identified the home's floor elevations, observed prior improper foundation repairs, and recommended further repairs. It also recommended correcting the second floor's sagging at the master bed and bathroom, and it recommended delaying repairing the foundation until after assessing the second floor's framing.

During Fall 2016, the Sellers made foundation repairs through Thompson Foundation Repair and attic repairs through Rob Sexton Construction. Thompson repaired the foundation per Jensen's April 2016 report. Jensen then inspected

3

Thompson's work and—after Thompson made further repairs—reinspected and wrote a December 2016 report stating, "Foundation repair work set forth in our report is now complete and in substantial compliance with our initial report. Interior foundation was not raised to level to avoid severe cosmetic damage to floor and wall finishes."

Additionally, according to the Sellers, Sexton Construction looked in the attic and opened the downstairs ceiling to assess the second floor's sagging and determined that the support beams for the home's heavy roof were improperly resting on a non-load-bearing wall, causing the sagging. So in the attic, Sexton installed a beam to a load-bearing wall to support the roof. Sexton also removed, replaced, and leveled the second floor's master sitting area.

## B. The Sellers hired a realtor and prepared the disclosure notice.

During these repairs and before Jensen's December 2016 report, the Sellers prepared to sell the home and hired the Sellers' Agent. They also filled out a Seller's Disclosure Notice (SDN) on their Agent's form to give to prospective buyers.

SDN Sections 12 and 13 concerned inspection reports and notices. The Sellers disclosed in Section 12 that they had "not received any notices in the last [five] years, either oral or written, regarding the need for repair or replacement of any portion of the [p]roperty from any governmental agency, appraiser, mortgage lender, repair service[,] or other, except: '4-13 Pier & Beam Needed Adjustments with Attic.'"

4

Under Section 13, which instructed the Sellers to list and attach any written inspection reports they had received in the last five years, the Sellers wrote,

13. List and attach any written Inspection reports that Seller has received in the last 5 years that were completed by persons who regularly provide inspections and who are either licensed as inspectors or otherwise permitted by law to perform inspections.

| Date of Inspection | Type of Inspection | Name of Inspector/Company | Number of Pages | Attached (Yes/No) |
|---|---|---|---|---|
| 4-13 | PIER & BEAM & ATTIC | TENSON ENGINEERS | | YES |
| | | | | |
| | | | | |

Explanatory comments by Seller, if any:
All Repairs made by Thompson Foundation & Rob Sexton Construction

In Section 14, which concerned structural information, the Sellers again disclosed that the foundation had been repaired in 2016, describing the repairs as "RE SUPPORT PIER & BEAM FOUNDATION." And on the next page in Section 21, the Sellers disclosed that they were aware of the house settling, explaining "Pier & Beam – Adjustments Have Been Done."

Sections 32 and 33 specifically concerned foundation information. The Sellers were asked the following two questions: (1) "Has the Seller ever obtained a written report about the condition of the foundation from any engineer, contractor, inspector, or expert?" and (2) "Have repairs been made to the foundation of the Property since its original construction?" Despite checking "Yes" to both questions and having disclosed the three companies earlier in the SDN, in the space provided in Sections 32 and 33, the Sellers did not identify any reports, indicate whether they had provided such reports to the listing broker, or explain any completed repairs. Directly behind the SDN form, the Sellers attached an email to their Agent stating among other

5

things, "The attachment from Thompson should be attached to our disclosure form[.] . . . Please add this to the disclosure form!" Undisputedly, the SDN did not mention TCS or Power Lift.

**C. The Buyers became interested in buying the home and received the SDN.**

The Sellers' Agent testified that she included the SDN—with the attached April 13, 2016 Jensen report and Thompson's repair records—in a bound brochure set out for prospective buyers. In late 2016, the Buyers attended showings of the Sellers' house and became interested in buying it. During one showing, the Sellers' Agent gave one of the bound brochures to the Buyers.

As we will explain below, the Sellers eventually came to dispute what was in the brochure. Linda recalled that it included Thompson's report, and although Joe admitted that he did not read the entire brochure, he and Linda claimed that the brochure did not include Jensen's report.[1]

Regardless, during the parties' negotiations, the brochure's contents were not at issue. The Buyers and Sellers signed a purchase contract in July 2017, and among its provisions, the Buyers agreed that (1) they were "accept[ing] the Property 'as is'" and

---

[1]The Sellers could not corroborate their statements because they did not retain their copy; Linda had given it to a friend and did not get it back.

(2) they had received the SDN.[2] Evidencing their receipt, the Buyers initialed every page of the SDN, including the follow-up email about the Thompson attachment.[3]

The Buyers acknowledged the following SDN provision: "A buyer should not rely on the above[-]cited reports as a reflection of the current condition of the [p]roperty. A buyer should obtain inspections from inspectors of the buyer's own choice." Additionally, the disclosures stated that they did "not constitute the representations" of the Sellers' Agent, and the Buyers expressly acknowledged that they "[were] not relying upon any statement or representation by the [Sellers' Agent] concerning the condition of the [p]roperty."

## D.  The Buyers became aware of foundation and structural issues and hired their own home inspector and engineer to inspect.

The Buyers personally visited the property at least four times and eventually admitted after filing suit that before buying the house, they had become aware of potential foundation and structural issues. During Joe's first visit to the house— before the Buyers signed the "as is" purchase agreement and the SDN specifically

---

[2]Joe later admitted that "without a doubt" he had read the "as is" clause. In fact, he emailed both his wife and their realtor acknowledging that they were buying the property "as is."

[3]The Buyers attached the SDN they signed to their live pleading, which referenced Jensen's attached report and Thompson's and Sexton's repairs. During his deposition, Joe swore under penalty of perjury that "[t]he [SDN] attached to my petition is a falsified [SDN] created by attorneys that I fired that didn't know what they're doing." Yet the Buyers never amended their petition, attached the exact same signed SDN to support their supplemental summary-judgment response, and offered nothing substantiating Joe's falsification assertion.

mentioning Jensen's attached "4-13" report—Joe admitted that "[he] noticed a foundation problem in the first three minutes [he] was there," noticing immediately "sagging archways" and "ceilings sagging." He swore under oath that he "almost f[e]ll down because the slope [was] so bad" and told his wife, "Linda, my God, this house has foundation problems." He also observed uneven floors, misaligned doorways, and archways that were "all screwed up." He testified that the misaligned doors signaled that "there's something wrong with the . . . support of the structure."

In fact, because of the Buyers' awareness of these issues and "to safeguard against hidden defects in the [property]," they hired the Inspectors to inspect the home and a structural engineer—Lighthouse Engineering L.L.C.—to inspect the foundation. The Inspectors' report indicated "unlevelness" in the flooring and "[r]ecommend[ed a] foundation/structural specialist evaluate and repair as needed." It also noted "[f]loor unlevelness . . . on the master closet. The framing appears to have deflected. This is typical for second floors."

The Lighthouse engineer separately inspected the foundation, determined there were "no red flags," and "judged the foundation to be in great shape." Lighthouse concluded that "the home does not need any leveling performed . . . as it is within acceptable slope tolerance. The foundation of the home is performing within performance tolerances[;] no foundation repairs are recommended."

After the two independent inspections, the Buyers requested that the Sellers make certain repairs, which the Sellers declined. But to close the deal, as part of a

8

contract amendment, the Sellers agreed to "transfer warranty on foundation to buyer" and credit $6,000 toward the Buyers' expenses.

On August 14, the sale closed for around $1.2 million. This was 44 days after the Buyers had signed the SDN identifying Jensen (and its attached "4-13" report), Thompson, and Sexton. During the entire process, the Buyers never spoke directly with the Sellers.

### E.   Post-closing, the Buyers had more engineering inspections and then sued nearly everyone involved in the home-buying process.

Shortly after closing, the Buyers' agent delivered another copy of Thompson's warranty.[4] Thompson's warranty was for one year and expired shortly after the closing. Thompson met with Joe and told him that he would "honor the workmanship[-]service guarantee for a few more months"—"up to November" 2017, which was a year after the completed work. The Buyers, however, did not ask Thompson to make any repairs under the warranty.

Rather, a few months later, the Buyers emailed their agent, claiming to have misplaced the SDN, and requested another one along with any house blueprints the Sellers might have. At that time, the Buyers began claiming that they had never received Jensen's April 13, 2016 report and were "shock[ed]" to even learn of it.[5] In

---

[4]Thompson's warranty stated, "In the event of sale, this warranty is transferable from owner to buyer."

[5]Joe wrote that "this whole 4-13 Jensen report came as an absolute shock to me when I read it after you sent the [SDN] to me. Both Linda and I knew nothing of it."

9

response to the email, the Buyers' agent sent the executed contract and the SDN that the Buyers had signed and pointed out that the SDN "refers to the Jensen engineering report." The agent also wrote, "The actual report was given to you guys as part of the hard copy packet when we were first looking at the home."

In early 2018, the Buyers retained another structural engineer, Brian E. Lingle, to inspect the home, and he opined that additional structural repairs were needed to repair the foundation and structure, including the second floor's sagging. Lingle eventually opined on various alleged deficiencies in Lighthouse's engineering inspection, concluding that Lighthouse's report was "negligent and misleading." Then in 2019, the Buyers had yet another engineer inspect the property, review various documents, and critique Lighthouse's and the Inspectors' opinions. That engineer similarly opined that Lighthouse's and the Inspectors' negligence had damaged the Buyers.

The Buyers sued the Sellers, the Sellers' Agent, and the Inspectors under a variety of legal theories, primarily alleging that the Sellers and their Agent had not

---

But the Buyers' agent testified that he was "[v]ery surprised" by Joe['s] saying that he had never before seen the Jensen report, and he testified that he "did not believe that to be an accurate statement." At one point, the Buyers' prior attorney indicated to the Buyers' agent that the Buyers "were hoping that [he] would be willing to testify that they did not receive copies of those reports." When the Buyers' agent explained that he could not so testify because he believed that they had received the reports, the Buyers "quit talking to [him]." As we previously stated, the SDN attached to the Buyers' live pleading referenced Jensen's "4-13" report and indicated that it was attached.

disclosed and had concealed foundation and structural problems and that the Inspectors had been negligent in failing to uncover various structural issues.[6] The Buyers alleged that they needed to gut the house—"a 100% demolition to the studs"—and rebuild it at a total cost of $2.9 million; they alternatively claimed that their property value had declined.

Each group of defendants moved for summary judgment. The Sellers and the Sellers' Agent each asserted traditional and no-evidence summary-judgment grounds.

Among the traditional grounds, both the Sellers and the Sellers' Agent maintained that the summary-judgment evidence conclusively negated essential elements of the Buyers' claims—particularly on the issues of causation and reliance running through the Buyers fraud- and misrepresentation-based claims. The Sellers and Sellers' Agent argued among other things that the Buyers (1) signed a contract agreeing to purchase the home "as is," (2) received the SDN disclosing the allegedly withheld information, (3) repeatedly inspected the property and were aware or on notice of the information they claimed had been withheld, and (4) hired their own home inspector and engineer to inspect the home's foundation and structure. Separately, the Inspectors argued in a traditional motion that the Buyers had agreed to limit their damages to the $1,299 inspection fee.

---

[6]The Buyers first sued the Sellers and others in Dallas County but then nonsuited that case and filed the underlying case in Denton County. In the underlying case, the Buyers also sued Lighthouse Engineering, L.L.C. and one of its engineers, but they nonsuited their claims against those defendants.

11

The Buyers responded to the three sets of motions. Upon considering them, the trial court granted summary judgment for all defendants. The Inspectors then conditionally stipulated to their liability and deposited $1,299 into the trial court's registry. Finally, after a jury trial on the Sellers' claimed attorneys' fees, the trial court signed a final judgment that the Buyers take nothing but the $1,299 that the Inspectors had deposited into the trial court's registry and awarded attorney's fees, expenses, and costs to the Sellers and the Sellers' Agent.[7]

## II. Issues

In three issues, the Buyers challenge the trial court's granting of each appellee group's summary-judgment motion. We will first set out the standard of review and then explain why the trial court correctly granted the motions.

## III. Standard of Review

When we analyze both no-evidence and traditional grounds for summary judgment, we typically address the no-evidence grounds first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). But here—where the Sellers and Sellers' Agent asserted both grounds and the Inspectors asserted only traditional grounds—we will review the propriety of granting the traditional summary-judgment motions first

---

[7]A jury awarded the Sellers $275,000 for trial-representation attorneys' fees, up to $77,000 for appellate attorneys' fees, and $6,000 for expenses. To avoid the uncertainty and expense of trial, the Buyers and Sellers' Agent consented to entry of a judgment awarding the Agent $145,000 for all "attorneys' fees, expenses[,] and court costs."

12

because they are dispositive of the Buyers' claims. *See D.R. Horton-Tex., Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 225 n.7 (Tex. App—Fort Worth 2013, no pet.) (addressing traditional summary judgment first because movant's affirmative defense was dispositive); *Reynolds v. Murphy*, 188 S.W.3d 252, 258 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g) (reviewing propriety of grant of traditional summary judgment before that of no-evidence summary judgment "because it is dispositive of the majority of [appellant's] claims").

We review a traditional summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action or that conclusively proves all elements of an affirmative defense barring a claim is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

### IV. The Sellers' Motion

In their first issue, the Buyers argue that the trial court erred by granting the Sellers' traditional motion for summary judgment on the following claims: (1) breach

of contract, (2) negligent misrepresentation, (3) gross negligence, (4) statutory fraud, (5) common-law fraud, and (6) DTPA violations. We disagree.

## A.    Law

### 1. Enforcing an "as is" agreement

A valid "as is" agreement prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995); *Volmich v. Neiman*, No. 02-12-00050-CV, 2013 WL 978770, at *3 (Tex. App.—Fort Worth Mar. 14, 2013, no pet.) (mem. op.). "By agreeing to purchase something 'as is,' a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong." *Prudential*, 896 S.W.2d at 161. "The sole cause of a buyer's injury in such circumstances, by his own admission, is the buyer himself." *Id.*

With an "as is" agreement, "[t]he seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Id.* Thus, when enforceable, an "as is" clause negates reliance and causation as a matter of law in DTPA, fraud, and negligence claims. *See id.* at 160–61; *Rich v. Olah*, 274 S.W.3d 878, 887 (Tex. App.—Dallas 2008, no pet.); *Cole v. Johnson*, 157 S.W.3d 856, 862 (Tex. App.—Fort Worth 2005, no pet.).

An "as is" clause may not be enforced (1) when a seller's fraudulent representation or concealment of information induces the buyer to enter into a contract or (2) when a seller impairs or obstructs the buyer's right to inspect the

14

property. *Hammond v. Hanser*, No. 01-22-00707-CV, 2024 WL 4628675, at *8 (Tex. App.—Houston [1st Dist.] Oct. 31, 2024, pet. denied) (mem. op.); *Millhollon v. Douglas*, No. 02-18-00105-CV, 2019 WL 6334695, at *17 (Tex. App.—Fort Worth Nov. 27, 2019, pet. denied) (mem. op.) (citing *Prudential*, 896 S.W.2d at 162). Even aside from these two exceptions, an "as is" clause could be unenforceable depending on the nature of the transaction and the totality of the circumstances surrounding the agreement. *Prudential*, 896 S.W.2d at 162; *Millhollon*, 2019 WL 6334695, at *17. Buyers bear the burden to demonstrate a genuine issue of material fact concerning the unenforceability of an "as is" clause. *Hammond*, 2024 WL 4628675, at *8; *Hall v. Rogers*, No. 01-19-00408-CV, 2021 WL 2653736, at * 5 (Tex. App.—Houston [1st Dist.] June 29, 2021, pet. denied) (mem. op.).

### 2. A seller's disclosures vis-à-vis a buyer's knowledge

Under Section 5.008 of the Texas Property Code, a seller of residential real property must give the property's purchaser written notice concerning his knowledge of the property's condition. *See* Tex. Prop. Code Ann. § 5.008. The written notice must contain, "at a minimum, all of the items in the notice prescribed by [that] section." *Id.* § 5.008(a). The notice "shall be completed to the best of [the] seller's belief and knowledge as of the date the notice is completed and signed by the seller." *Id.* § 5.008(d). Notably, the statute "does not impose a continuing duty to update the [SDN]." *Hall*, 2021 WL 2653736, at *6 (quoting *Van Duren v. Chife*, 569 S.W.3d 176, 186–87 (Tex. App.—Houston [1st Dist.] 2018, no pet.), *disapproved on other grounds*,

15

*Sealy Emerg. Room, L.L.C. v. Free Standing Emerg. Room Mgrs. of Am., L.L.C.*, 685 S.W.3d 816, 821 & n.4 (Tex. 2024)).

Encompassed within this framework, "a seller is under a duty to disclose material facts that would not be discoverable by the exercise of ordinary care and diligence by the purchaser, or that a reasonable investigation and inquiry would not uncover." *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App.—Dallas 2010, pet. denied) (first citing *Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979); and then citing *Marshall v. Kusch*, 84 S.W.3d 781, 786 (Tex. App.—Dallas 2002, pet. denied)); *Cole*, 157 S.W.3d at 860. But "[a] seller has no duty to disclose facts he does not know." *Prudential*, 896 S.W.2d at 162; *see also HTM Rests., Inc. v. Goldman, Sachs & Co.*, 797 S.W.2d 326, 329 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (holding that party cannot be guilty of fraudulently concealing facts of which he is not aware). Likewise, a seller is not liable for failing to disclose what he only should have known. *Prudential*, 896 S.W.2d at 162. This is because a seller has no duty to investigate any concerns he may have, nor is he required to disclose any of those concerns. *Id.* at 162–63; *Pham v. Archer*, No. 02-23-00450-CV, 2025 WL 211354, at *6 (Tex. App.—Fort Worth Jan. 16, 2025, no pet.) (mem. op.).

Additionally, a seller is not required to disclose any knowledge of past conditions on the property that are not known to exist when the SDN is signed. *Hammond*, 2024 WL 4628675, at *9. "Knowledge of past repairs does not establish knowledge of a present defect[.]" *Van Duren*, 569 S.W.3d at 186–87, 188 (holding that

16

knowledge of leak that was repaired, without more, does not support inference of knowledge of existing defect). "Thus, a seller has no duty to disclose a condition or defect [that] was previously repaired or remedied." *Hall*, 2021 WL 2653736, at *6; *see Pfieffer v. Ebby Halliday Real Estate, Inc.*, 747 S.W.2d 887, 890 (Tex. App.—Dallas 1988, no writ) ("[R]epairs correct defects, not prove their continued known existence.").

Moreover, "a party who has actual knowledge of specific facts cannot have [justifiably] relied on a misrepresentation of the same facts." *Mead v. Gray*, No. 02-16-00177-CV, 2017 WL 1738066, at *2 (Tex. App.—Fort Worth May 4, 2017, pet denied) (mem. op.) (collecting cases); *see Pham*, 2025 WL 211354, at *6. As this court stated in *Mead*,

> regardless of whether the seller failed to disclose information or concealed information, when the buyer ultimately possesses that same information (albeit from a different source than the seller) and nonetheless proceeds to purchase the home, then the buyer cannot have relied on the seller's failure to disclose or misrepresentation of those same facts in making the decision to purchase the home.

2017 WL 1738066, at *3; *see also Williams v. Dardenne*, 345 S.W.3d 118, 127 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("The absence of reliance evidence is particularly troublesome in this case, because the information contained in the undisclosed report was duplicative of the information contained in the reports that were disclosed."); *Lim v. Lomeli*, No. 04-06-00389-CV, 2007 WL 2428078, at *4 (Tex. App.—San Antonio Aug. 29, 2007, no pet.) (mem. op.) (holding that buyers could not prove reliance on their real estate agent's alleged misrepresentations and

17

nondisclosures regarding water damage when such damage was visible and also disclosed in buyer's inspection report); *Cole*, 157 S.W.3d at 860–61 (holding that buyer could not prevail against seller because signs of foundation issues and history of foundation repair was otherwise disclosed to buyer); *Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 311 (Tex. App.—Fort Worth 1993, no writ) (stating, in case where seller failed to disclose prior foundation repair but buyer discovered foundation settling in independent investigation, "when a person makes his own investigation of the facts, and knows the representations are false, he cannot, as a matter of law, be said to have relied upon the misrepresentations of another").

## B.    Analysis

### 1. Fraud- and misrepresentation-based claims

In their summary-judgment motion, the Sellers argued that the "as is" clause negated the Buyers' reliance and causation elements of their fraud- and misrepresentation-based claims and that the Buyers could not avoid the clause's enforcement by claiming that the Sellers fraudulently induced the Buyers to purchase the property. We agree.

Undisputedly, the Buyers signed a contract containing an "as is" clause. Thus, by agreeing to purchase the property "as is," the Buyers agreed to make their own property appraisal, and they accepted the risk that they could be wrong. *See Prudential*, 896 S.W.2d at 161. This the Buyers do not dispute. Moreover, the Buyers neither contend that the Sellers impaired or obstructed their right to inspect the property, *see*

18

*Hammond*, 2024 WL 4628675, at *8, nor do they challenge the "as is" clause based on a totality-of-the-circumstances argument, *see Prudential*, 896 S.W.2d at 162; *Millhollon*, 2019 WL 6334695, at *17.

Rather, the Buyers argue that the trial court should not have enforced the "as is" clause because they raised a genuine issue of material fact that the Sellers fraudulently induced them to buy the property. In their summary-judgment response, the Buyers asserted, "The evidence of withholding, concealing[,] and/or secreting of material information concerning the foundation and the superstructure of the home itself, and other required disclosures withheld, are some evidence – more than a scintilla – invalidating the 'as-is' clause."

In support of this position, the Buyers specifically complained that the Sellers never disclosed the 2014 TCS report, the 2014 Power Lift repair records, or the April 13, 2016 Jensen report. Thus, the Buyers claimed not to have known about defects in the home's foundation and structure, including the sagging second floor. And they contend that the Buyers "cannot hide behind the 'as is' clause to avoid being held liable" for selling defective property.

We reiterate that the SDN that the Buyers signed on July 1, 2017 and that they attached to both their live pleading and their summary-judgment response—and which we have quoted above—disclosed the "4-13" Jensen report and indicated that it was attached to the SDN. Moreover, the SDN affirmatively disclosed prior foundation and attic repairs.

19

The Buyers have repeatedly contested receiving the Jensen report and have complained that the report was not uploaded to the Multiple Listing Service as part of the electronically available SDN. But even taking as true that the April 13, 2016 Jensen report was not attached to any version of the SDN delivered or electronically available to the Buyers through the MLS, the record conclusively demonstrates that the report's existence was disclosed in the SDN that the Buyers signed.

In that report, as the Sellers have highlighted, Jensen identified foundation and other structural defects, including the sagging second floors, and outlined repair recommendations. Undisputedly, the Sellers disclosed that they had hired contractors—Thompson and Sexton—whom the Sellers thought had made the identified repairs. Even with the repairs made, the house was not perfectly made level to avoid interior cosmetic damages—a fact that the Sellers did not conceal and which the Buyers acknowledged knowing before closing.[8]

We thus agree with the Sellers that the evidence conclusively demonstrates that the Jensen report and the contractors' repairs were not concealed from the Buyers; the SDN affirmatively disclosed them. The SDN thus put the Buyers on notice of (1) the contents of the referenced Jensen report and (2) the work of the contractors

---

[8]The Buyers' Inspectors noted that the house was not uniformly level and pointed out flooring issues on the first and second floors, and the Buyers' first engineer—Lighthouse—took first-floor elevations showing that the house was not perfectly level but determined that the foundation was performing properly.

20

identified in the SDN and gave the Buyers the opportunity to investigate what had been disclosed. And the Buyers had time to ask for the allegedly missing but actually disclosed information as they investigated the property—they simply did not.

Indeed, 44 days passed between the Buyers' signing the SDN and their closing on the deal during which they could have inquired about what the SDN disclosed. But Linda admitted in her deposition that the Buyers never asked their agent about the allegedly missing Jensen report or about the SDN's statements disclosing Thompson's and Sexton's repairs to the property. Likewise, the Buyers' agent testified that the Buyers never asked him any questions about the SDN, including whether information in the SDN was missing that could have been requested, such as from Jensen or Thompson.

Instead of asking for the allegedly missing documents, during the 44-day window the Buyers repeatedly examined the property and admittedly became aware of various property defects. As we have noted, within the first three minutes of being in the house, Joe determined that the house had foundation problems. He testified to immediately seeing "sagging archways," "ceilings sagging," "uneven floors," and misaligned doorways. From the misaligned doors, Joe admitted that he had determined that "there's something wrong with the . . . support of the structure." And he further admitted that he had voiced his concerns about the foundation to his wife. Thus, the record demonstrates that the Buyers knew of potential foundation and structural issues, including sagging related to the second-story floors. And yet they

decided—despite their personal observations of structural defects as well as those of their Inspectors, who had specifically pointed out flooring issues on both floors—to purchase the property.

The record thus conclusively demonstrates the following: (1) through the SDN that the Buyers signed, the Sellers put the Buyers on notice of the property's defects contained in Jensen's report and that repairs had been attempted by Thompson and Sexton;[9] and (2) through the Buyers' own inspections, as well as their Inspectors' report, the Buyers had actual knowledge of the same defects that were identified in the April 13, 2016 Jensen report and that Thompson and Sexton had purportedly repaired. *See Mead*, 2017 WL 1738066, at *2; *Williams*, 345 S.W.3d at 127; *Lim*, 2007 WL 2428078, at *4; *Cole*, 157 S.W.3d at 860–61; *Camden Mach. & Tool, Inc.*, 870 S.W.2d at 311. Accordingly, because the record evidence conclusively negates the

---

[9]Concerning the Sellers' alleged concealment of foundation defects identified in 2014, the June 2014 TCS report identified the home's foundation issues at that time—not when the Sellers prepared the SDN in October 2016—and the Power Lift repair records likewise identified attempted repairs in 2014. In contrast, the 2016 Jensen report identified the state of the house's foundation at the time of the SDN, identified prior improper foundation repairs, and outlined foundation repairs that Thompson eventually made. In short, the Sellers met their obligation to disclose the state of the foundation and structure in October 2016—when they prepared the SDN—by disclosing Jensen, Thompson, and Sexton. *See* Tex. Prop. Code Ann. § 5.008(d). The Buyers therefore cannot claim that they were fraudulently induced to buy the home through the alleged concealment of outdated 2014 documents that did not accurately represent the state of the house when the Sellers disclosed Jensen's April 2016 report that contained the most up-to-date information the Sellers had from an expert evaluating the property. *See Hammond*, 2024 WL 4628675, at *9; *Hall*, 2021 WL 2653736, at *6; *Mead*, 2017 WL 1738066, at *3; *Williams*, 345 S.W.3d at 127; *Pfieffer*, 747 S.W.2d at 890.

22

reliance and causation elements of the Buyers' non-contractual claims, we conclude that the trial court properly granted the Sellers' traditional motion for summary judgment disposing of those claims by enforcing the "as is" clause.[10] *See Prudential*, 896 S.W.2d at 160–61; *Rich*, 274 S.W.3d at 887; *Cole*, 157 S.W.3d at 862.

### 2. Breach-of-contract claim

We next consider whether the trial court properly granted summary judgment on the Buyers' breach-of-contract claim, the elements of which are: (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach of the contract, and (4) resulting damages to the plaintiff. *Old Am. Ins. Co. v. Lincoln Factoring, LLC*, 571 S.W.3d 271, 282 (Tex. App.—Fort Worth 2018, no pet.). Only the breach element was at issue in the Sellers' traditional summary-judgment motion, so we focus on it.

---

[10]By granting summary judgment on the Buyers' negligence claim, the trial court properly granted summary judgment on their gross-negligence claim. *See Taylor v. Baylor Scott & White Med. Ctr.-Frisco*, No. 05-20-00352-CV, 2022 WL 405896, at *9 (Tex. App.—Dallas Feb. 10, 2022, no pet.) (mem. op.) (first citing *Sonic Sys. Int'l, Inc. v. Croix*, 278 S.W.3d 377, 394–95 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); and then citing *Seaway Prod. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 659 (Tex. App.—Fort Worth 2004, no pet.)). Likewise, because the trial court properly granted summary judgment on the Buyers' fraud claims, it also properly granted summary judgment on their request for a constructive trust. *See Rainier Southlake DST v. Woodbury Strategic Partners Fund, LP*, No. 02-16-00263-CV, 2017 WL 6047725, at *12 (Tex. App.—Fort Worth Dec. 7, 2017, no pet.) (mem. op.).

In their contract claim, the Buyers pleaded that the Sellers breached the provision in the purchase agreement to "transfer warranty on foundation to buyer."[11] The Buyers' position rests on an email exchange the day after closing. A person named Laura (who appears to have worked with the Sellers' Agent) requested from Thompson "the steel pier warranty as well as the lifetime limited warranty for Pinehurst." Thompson responded by forwarding a document to Laura, and she sent it to the Sellers' Agent. The forwarded document is not in the record, but the Sellers' Agent responded to Laura, "So basically this has expired…." [Punctuation in original.]

Assuming that the emails referred to Thompson's one-year warranty, the written warranty and Thompsons' own deposition evidenced the warranty's expiration date—not the Seller's Agent's internal email. Thompson performed work at the property in August 2016, and its final invoice was dated August 22, 2016. Thompson's contract stated that upon work completion and final payment, Thompson "will issue a warranty certificate to the owner(s), said warranty certificate will cover all work

---

[11]Throughout their summary-judgment briefing and on appeal, the Buyers repeatedly claim that the Sellers agreed to transfer a so-called "lifetime" warranty. We must look to the words of the written contract between the Buyers and Sellers about their warranty, and in doing so, we see no mention of a "lifetime" warranty. *See Am. Midstream (Ala. Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 714 S.W.3d 572, 579 (Tex. 2025). We therefore reject any notion that we can or should insert the word "lifetime" into the purchase agreement's foundation-warranty-transfer provision. *See id.* (stating that courts may not interpret a contract to disturb the parties' agreed-upon risk allocation). The Sellers agreed to the Buyers' amendment, under which the Sellers agreed to "transfer warranty on foundation to buyer." The only warranty on the foundation was Thompson's, and the record shows that it transferred upon sale.

performed by contractor for a period of one full year to the terms and conditions specifically set forth in writing by the certificate."[12] Thompson admitted that after Jensen had inspected his August work, he had to make additional repairs in late 2016. Because of this, Thompson had informed the Buyers that he "would have taken it up to November."[13]

The record evidence conclusively established that the warranty transferred upon sale, which took place on August 14, 2017, and it further showed that Thompson had agreed to honor it until November 2017. Based on the testimony of when Thompson had completed its work, the transferred warranty had not expired as of the August 14, 2017 closing date. But even if one viewed the expiration of the warranty as being one year from Thompson's August 22, 2016 final invoice, its one-year warranty on the foundation had not expired as of the closing date. Accordingly, because the evidence conclusively demonstrated that the Sellers did transfer the warranty on the foundation to the Buyers, which had not expired as of the closing date, we conclude that the trial court properly granted summary judgment that the Buyers take nothing on their breach-of-contract claim for allegedly failing to transfer the warranty on the foundation.

---

[12]Linda testified that the sales brochure that she had received but given away contained Thompson's records.

[13]Joe also confirmed in his deposition that Thompson said he would "honor the workmanship[-]service guarantee for a few more months."

In sum, we hold that the trial court properly granted summary judgment that the Buyers take nothing on their claims against the Sellers. We thus overrule the Buyers' first issue.

## V. The Sellers' Agent's Motion

In their second issue, the Buyers maintain that the trial court erred by granting the Sellers' Agent's summary-judgment motion on the Buyers' claims for negligence, gross negligence, common-law fraud, and DTPA violations. We disagree.

### A. Law

Sellers of real property have a statutory duty to complete the SDN; their agents do not. *See* Tex. Prop. Code Ann. § 5.008(a), (d); *Hammond*, 2024 WL 4628675, at *13–14; *MacPherson v. Pena*, No. 09-20-00221-CV, 2022 WL 17685119, at *7 (Tex. App.—Beaumont Dec. 15, 2022, no pet.) (mem. op.). "[U]nless a broker or real estate agent knows [that] information in [an SDN] is false, a real estate agent and the agency she works for [are] generally not liable for the representations or omissions in the [SDN] because the representations in the [SDN] are the seller's alone." *Pena*, 2022 WL 17685119, at *7 (citing *Van Duren*, 569 S.W.3d at 188); *see also* Tex. Occ. Code Ann. § 1101.805(e) (creating exception that applies if broker is shown to have known that sellers made false representation, or knows that seller misrepresented or concealed material facts and broker failed to disclose his own knowledge of seller's misrepresentation or concealment); *Kubinsky v. Van Zandt Realtors*, 811 S.W.2d 711, 714–15 (Tex. App.—Fort Worth 1991, writ denied) (holding that listing real-estate

26

agent has no legal duty to inspect listed property for defects over and above asking the sellers if such defects exist and stating that "the imposition of such liability . . . should be left to the Texas Legislature").

Without needing to restate the law concerning "as is" clauses, we further point out that an enforceable "as is" clause can negate the reliance and causation elements of a buyer's claim against not only a seller but also a seller's agent. *See Hammond*, 2024 WL 4628675, at \*13–14; *Grove v. Franke*, No. 09-18-00119-CV, 2019 WL 5243152, at \*4–5 (Tex. App.—Beaumont Oct. 17, 2019, pet. denied) (mem. op.); *Van Duren*, 569 S.W.3d at 190.

## B.   Analysis

As we have stated, the Buyers agreed to purchase the property "as is," and the Sellers' Agent moved for a traditional summary judgment, arguing that the "as is" clause negated the reliance and causation elements of the Buyers' claims against the Sellers' Agent. Like the Buyers' failed efforts to circumvent that clause against the Sellers, the Buyers make the similarly flawed argument that the "as is" clause did not bar their claim against the Sellers' Agent because she had fraudulently induced them to purchase the property. The Buyers point to evidence of three alleged fraudulent inducements, which we will address in turn.

*First*, the Buyers claim that the Sellers' Agent knew of the structural issues discussed in Jensen's April 2016 report that they claim was not attached to the SDN or provided to them. The Buyers specifically argue that the Sellers' Agent "allowed the

27

[SDN], a standard and required form that they drafted, to create the false impression that the Property was in sound condition and omitted those reports."

But the Sellers filled out and signed the SDN. And the SDN expressly stated the following:

- "[it] is a disclosure of Seller's knowledge of the condition of the property as of the date of the seller's signature indicated below";

- "[it] is not a warranty of any kind by the . . . listing broker"; and

- "the following statements are representations made by the seller(s) based on seller's knowledge and are not representations of the [Sellers' Agent]."

*See Pena*, 2022 WL 17685119, at *7 & n.18 (discussing similarly worded seller's disclosure form). The SDN's representations were the Sellers'—not the Sellers' Agent's. *See id.*; *Van Duren*, 569 S.W.3d at 188.

The Sellers' Agent would have a duty to come forward only if she had a reason to believe that the SDN was false or inaccurate, and the only way she could be held liable for the Sellers' statements in the SDN is if they were shown to be untrue and the Agent knew it. *See Sherman v. Elkowitz*, 130 S.W.3d 316, 321 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also Douet v. Romero*, No. 14-21-00365-CV, 2022 WL 16942867, at *6 (Tex. App.—Houston [14th Dist.] Nov. 15, 2022, no pet.) (mem. op.). Here, the SDN specifically disclosed the existence of the "4-13" Jensen report, and the Buyers were independently aware from their own inspections and their Inspectors' of the same defects that Jensen identified in its April 2016 report. Accordingly, the Buyers did not carry their burden of showing that the Sellers' Agent

28

knew that the Sellers had misrepresented or concealed material facts in their SDN. *See* Tex. Occ. Code Ann. § 1101.805(e); *Kubinsky*, 811 S.W.2d at 714.

*Second*, in support of their fraudulent-inducement assertion, the Buyers point to Joe's deposition testimony concerning what the Sellers' Agent told him after he yelled to his wife during his first inspection: "Linda, my God, this house has foundation problems." According to Joe, the Sellers' Agent responded, "[N]o, sir, this house does not have foundation problems. Steel beams have been placed underneath. Its's a pier-and-beam foundation and the walls ha[ve] not yet been raised for cosmetic reasons and there's a transferable foundation warranty." Joe claims that these statements constituted affirmative misrepresentations that fraudulently induced the Buyers to close.

Again, the Buyers were charged with notice of the contents of the information disclosed in the SDN. This included Jensen's observations and conclusions in its April 13, 2016 report and the fact that Thompson and Sexton had made repairs. Thompson's report—which Linda testified had been included in the Sellers' Agent's brochure—stated that Thompson had replaced wood shims with steel shims, had installed steel channel, and had made repairs to the pier-and-beam foundation per Jensen's report. Both the Buyers' engineer and Jensen in December 2016 had observed that the house was not perfectly leveled to protect interior finishes. And Thompson's agreement with the Sellers included a transferable one-year warranty. So the Sellers' Agent truthfully informed Joe of facts that (1) were disclosed in Jensen's

29

report and Thompson's records and (2) the Buyers had learned about through their Inspectors' investigation.

Simply put, the Buyers produced no evidence that the Sellers' Agent knew the falsity of any of her statements to Joe during his inspection or knew that the repairs Thompson had made were improper such that structural defects still existed. Thus, the Buyers failed to raise a genuine issue of material fact concerning the allegedly known falsity of the Sellers' Agent's oral statements to Joe. *See* Tex. Occ. Code Ann. § 1101.805(e); *Kubinsky*, 811 S.W.2d at 714.

*Third*, the Buyers claim that the Sellers' Agent misrepresented that the transferable foundation warranty was a "lifetime" warranty, which had fraudulently induced the Buyers to purchase the home. But no evidence showed that the Sellers' Agent ever told the Buyers that the foundation warranty was a "lifetime" warranty. On this point, Joe testified that the Sellers' Agent had informed him "there's a transferable warranty." Neither he nor Linda testified that the Seller's Agent had represented that the warranty was a "lifetime" warranty.

The only place the Buyers cite in the record using the word "lifetime" warranty was an email from the Sellers' Agent to the Sellers. That email concerned the Buyers' forwarding their Inspectors' 76-page report and asking the Sellers to make various repairs. As the Sellers' Agent commented on sundry items, she wrote, "HVAC system probably needs to be serviced. They have a lifetime warranty on the foundation, minor things on the roof. . . ."

The Sellers Agent argues that she "mistakenly" used the word "lifetime," but regardless of her belief about the warranty's term, the record does not show that this particular email between a realtor and her clients was ever forwarded to the Buyers. And the record does not contain any evidence that the Sellers' Agent ever told the Buyers that they were getting a "lifetime" warranty. In fact, the contract amendment—which the Buyers agreed upon and to which we must look—did not contain such language and provided that the Sellers had agreed to "transfer warranty on foundation to buyer." *See Am. Midstream (Ala. Intrastate), LLC*, 714 S.W.3d at 579. Thus, the Buyers failed to demonstrate that the Sellers' Agent falsely represented to the Buyers the existence of a transferrable "lifetime" foundation warranty that had induced them to buy the property.

Having rejected each of the Buyers' three claimed areas of fraudulent inducement concerning the Sellers' Agent, we conclude that the trial court's summary judgment in favor of the Sellers' Agent on the Buyers' claims for negligence, gross negligence, common-law fraud, and DTPA violations was supported by the purchase agreement's enforceable "as is" clause. *See Hammond*, 2024 WL 4628675, at *12–13. We overrule the Buyers' second issue.

## VI. The Inspectors' Motion

In their third issue, the Buyers state that they "sued [their Inspectors] for negligence" and argue that the trial court erred by applying the following

limitation-of-liability clause—the only clause with red lettering—in the Inspectors'

agreement to the Buyers' claims against them:

IV. LIMITATION OF LIABILITY
BY SIGNING THIS AGREEMENT, CLIENT ACKNOWLEDGES THAT THE INSPECTION FEE PAID TO THE INSPECTOR IS NOMINAL GIVEN THE RISK OF LIABILITY ASSOCIATED WITH PERFORMING HOME INSPECTIONS IF LIABILITY COULD NOT BE LIMITED. CLIENT ACKNOWLEDGES THAT WITHOUT THE ABILITY TO LIMIT LIABILITY, THE INSPECTOR WOULD BE FORCED TO CHARGE CLIENT MUCH MORE THAN THE INSPECTION FEE FOR THE INSPECTOR'S SERVICES. CLIENT ACKNOWLEDGES BEING GIVEN THE OPPORTUNITY TO HAVE THIS AGREEMENT REVIEWED BY COUNSEL OF HIS OR HER OWN CHOOSING AND FURTHER ACKNOWLEDGES THE OPPORTUNITY OF HIRING A DIFFERENT INSPECTOR TO PERFORM THE INSPECTION. BY SIGNING THIS AGREEMENT, CLIENT AGREES TO LIABILITY BEING LIMITED TO THE AMOUNT OF THE INSPECTION FEE PAID BY THE CLIENT.

INITIALED BY CLIENT: _____    FEE PAID: $ 1299.00

We agree that the trial court properly granted the Inspectors' summary-judgment

motion enforcing this limitation-of-liability clause.

## A.    Law

"Texas favors freedom of contract." *Atrium Med. Ctr., LP v. Hous. Red C LLC*,

595 S.W.3d 188, 192 (Tex. 2020). "In the absence of a controlling public policy to the

contrary, contracting parties can limit their liability in damages to a specified amount."

*Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 748 (Tex. App.—Fort Worth 2005, no

pet.) (citing *Fox Elec. Co. v. Tone Guard Sec., Inc.*, 861 S.W.2d 79, 82–83 (Tex. App.—

Fort Worth 1993, no writ)).

Courts considering such provisions "look to the relationship of the parties and

their bargaining power" and "consider the entire atmosphere in which the agreement

was made." *Id.*; *Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex. 1974). A bargain

should not be negated simply because one party may have been in a more

advantageous bargaining position. *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232–

32

33 (Tex. 2008) (orig. proceeding). Overall, courts must "consider whether a contract results in unfair surprise or oppression." *Id.*

In *Head*, we considered the enforceability of a contractual $500 damages cap—the amount of a home-inspection fee—that limited the damages a home purchaser could recover against her home inspector. 159 S.W.3d at 747–48. We observed that the "clause was conspicuously set apart in the [i]nspection [a]greement, enclosed in a box, and separately initialed by [the home purchaser]." *Id.* at 748. Moreover, we stated that the purchaser had not been forced to hire the particular inspector, had been represented by a lawyer, and had obtained other house inspections. *Id.*

On those facts, we determined that there was no bargaining-power disparity. *Id.* We further explained that "without the ability to limit liability, the costs of home inspection services would likely increase, which might make this service unaffordable," and we held that the contractual $500 damages cap was not unconscionable. *Id.* at 749. We thus determined that the trial court had correctly applied the clause limiting the home purchaser's damages against her inspector to the recovery of the inspection fee. *Id.*

## B. Analysis

In this case, the Buyers were experienced home buyers and were represented by a real-estate agent. Most of the inspection agreement is written in black, type-written ink. In contrast, the limitation-of-liability clause stands out because it is typed in red

letters, uses all caps, and is enclosed inside a box. Joe specifically initialed inside the box beside the stated fee he had paid for the inspection.[14]

Per the wording of the clause, the Buyers "acknowledge[d] being given the opportunity to have [the] agreement reviewed by counsel of his or her own choosing and further acknowledge[d] the opportunity of hiring a different inspector."[15] And in fact, the Buyers did separately hire Lighthouse to inspect the house's foundation. The facts are remarkably similar to those in *Head*, and on this record, we similarly conclude that the trial court properly upheld and applied the limitation-of-liability clause. *See id.*[16] We therefore overrule the Buyers' third issue.[17]

---

[14]Linda argued in the trial court that the Inspectors could not enforce the damages limitation against her because she had not signed the agreement, but she has abandoned that argument on appeal. *See Silva v. Diaz*, No. 05-20-00443-CV, 2022 WL 3500008, at *12 n.8 (Tex. App.—Dallas Aug. 18, 2022, no pet.) (mem. op.) (treating argument as abandoned that appellant had made in the trial court but did not brief on appeal).

[15]Similar to *Head*'s stated rationale, under the provision at issue, Joe "acknowledge[d] that the inspection fee paid to the inspector [was] nominal given the risk of liability associated with performing home inspections," and that the Inspectors would "be forced to charge" a higher fee without the damages limitation. *See* 159 S.W.3d at 749 ("[The home purchaser] paid a small fee for a visual inspection of her home, and prohibiting [the inspector] from limiting liability could subject it to a significant risk of liability.").

[16]The Buyers did not cite *Head* in response to the Inspectors' summary-judgement motion or in their appellate briefing. Rather, they argue that the limitation-of-liability provision is unenforceable because it operates as a pre-injury release and does not satisfy the express-negligence doctrine under *Dresser Industries, Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507–11 (Tex. 1993). In *Dresser*, the supreme court examined a contract provision that released Dresser from all liability claims caused by its own future negligence—not one that merely capped the recoverable

## VII. Conclusion

Having overruled the Buyers' three issues, we affirm the trial court's final judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: March 19, 2026

---

damages resulting from Dresser's liability. *Id.* at 506–07. Importantly, the court's "holding in *Dresser* is explicitly limited to releases and indemnity clauses in which one party exculpates itself from its own future negligence." *Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 386–87 (Tex. 1997); *Dresser*, 853 S.W.2d at 507 & n.1. Here, we are not being asked to examine a pre-injury release or an indemnity clause; rather, before us is a damages cap, and *Head* governs.

[17]We need not reach the Buyers' additional arguments concerning the other grounds in Appellees' summary-judgment motions. *See* Tex. R. App. P. 47.1